UNITED STATES of America,

v.

Dean Anthony BECKFORD, Claude Gerald Dennis, Leonel Romeo Cazaco and Richard Anthony Thomas.

Criminal Nos. 3:96CR66–01, 3:96CR66–05 to 3:96CR66–07.

United States District Court,
E.D. Virginia,
Richmond Division.

April 18, 1997.

Gerald T. Zerkin, Robert J. Wagner, Richmond, VA, for Dean Anthony Beckford.

John C. Jones, Quinton, VA, Scott Brettschneider, Kew Gardens, NY, for Claude Gerald Dennis.

Reginald M. Barley, Cary B. Bowen, Bowen & Bowen, Richmond, VA, for Leonel Romeo Cazaco.

David P. Baugh, Elizabeth D. Scher, Morchower, Luxton & Whaley, Richmond, VA, for Richard Anthony Thomas.

David Novak, Stephen Miller, Andrew McBridge, Assistant United States Attorneys, Richmond, VA, for U.S.

## MEMORANDUM OPINION

PAYNE, District Judge.

Defendants Dean Anthony Beckford, Claude Gerald Dennis, Leonel Romeo Cazaco and Richard Anthony Thomas have been charged in the Superseding Indictment with intentional killing in furtherance of a Continuing Criminal Enterprise ("CCE") and a drug trafficking offense punishable under 21 U.S.C. § 841(b)(1)(A), in violation of 21 U.S.C. § 848(e). Pursuant to 21 U.S.C. § 848(h), the Government has notified each defendant that it intends to seek a penalty of death in the event of conviction and has posited with specificity the statutory and non-statutory aggravating factors which it will seek to prove as the basis for imposition of the death penalty. This is, then, a capital case under Section 848(e).

The defendants seek pre-trial discovery pursuant to the rules of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, under which the Government is required to disclose to the accused any favorable evidence in its possession that is material to guilt or punishment. Specifically, the defendants seek the entry of an order requiring the Government to produce:

(a) any information in the possession of the Government which indicates that an alleged murder victim was engaged in criminal activities, specifically drug-related

transactions or activities, at the time of his death [1]; and

>(b) any material in the possession of the Government which relates to all criminal acts of all co-defendants and co-conspirators, in furtherance of or in connection with the drug conspiracy, the continuing criminal enterprise, and the racketeering activity charged in the Superseding Indictment.[2]

The defendants assert that the requested evidence is relevant to the establishment of two mitigating circumstances under 21 U.S.C. § 848(m), specifically subsections (8) and (9) of that provision, and thus that the evidence would support a sentence of life imprisonment as opposed to the death penalty. In the alternative, the defendants claim that the requested evidence constitutes other information relevant to mitigating factors and is thus admissible at the penalty phase under § 848(m)(10) or § 848(j). In either case, the information sought would be material to punishment and would constitute "evidence favorable to the accused" under *Brady*.

The Government opposes production of this evidence under *Brady* for the simple reason that the requested material is not relevant to the establishment of the mitigating circumstances defined in Sections 848(m)(8), (m)(9), and (m)(10) and is not otherwise "favorable" to the defense or "material" to sentencing under *Brady* and its progeny.

## BACKGROUND

The charges set forth in the Superseding Indictment pertain to the various criminal activities of members of the so-called "Poison Clan" drug trafficking organization. Two specific incidents, which resulted in five murders and the shootings of two other victims, constitute the bases for the capital charges against Dean Beckford, Claude Dennis, Leonel Cazaco and Richard Thomas.

## I. The Ambrose and Miller Murders

The capital charges against Dean Beckford and Claude Dennis arise out of their alleged participation in the murders of Sherman Ambrose and Dasmond Miller, and the shooting of Delroy Smith. *See* Superceding Indictment, Counts 5–6. The Superseding Indictment alleges that, beginning in July of 1988, Dean Beckford, who later became the leader of the Poison Clan, took "workers" from Brooklyn, New York, to assist him in the distribution of "crack" cocaine in Richmond, Virginia. Superseding Indictment, Count 3, Overt Act 5. Ambrose, Miller and Smith were some of the so-called "workers" who came to Richmond with Dean Beckford. *Id.* Sometime between their arrival in Richmond in July, 1988 and December 4, 1988, it is asserted that Ambrose, Miller and Smith fell into disfavor with Dean Beckford. And, if the facts alleged in the Superseding Indictment are true, being the object of Dean Beckford's dislike or mistrust was a most risky condition. For it is alleged that, on December 4, 1988, Dean Beckford and Claude Dennis [3] intentionally shot Ambrose and Miller to death and critically wounded Smith.

1. The defendants' Motion For Tender Of *Brady* and *Kyles* Material Concerning The Extent Of Involvement In Criminal Activity Of Any Person Alleged To Be A "Victim" By The United States was originally filed by defendant Thomas on November 14, 1996. Subsequently, Defendant Cazaco adopted Thomas' motion and filed a pleading in support thereof. Thomas' motion was originally heard on December 2, 1996, and the parties were then ordered by the Court to file supplemental briefs respecting the interpretation of the mitigating factor set forth in Section 848(m)(9). At that time, Dean Beckford was a fugitive at large in New York City; he was eventually apprehended and subsequently arraigned before this Court on December 23, 1996. Due to Beckford's belated entry into these proceedings, and at his request, this Court delayed disposition of the motion until which time Beckford could be heard on the matter. Beckford has since adopted Thomas' motion and has filed a memorandum of law in support thereof.

2. The defendants' Motion For Tender Of *Brady* And *Kyles* Material Of Unlawful And Violent Acts Of Co-Conspirators was originally filed by Dean Beckford on February 27, 1997; the motion has subsequently been adopted by Dennis, Cazaco and Thomas.

3. Dennis was previously tried for the Ambrose and Miller murders in Virginia state court in 1990; he was ultimately acquitted of the charges. *See Commonwealth v. Dennis*, Criminal No. 89–221–F and 89–222–F (Va.1989).

The events leading to the murders of Ambrose and Miller began on the night of December 3, 1988, when Dean Beckford, Dennis, and Oliver Wiltshire[4] entered the apartment at 1514 Tifton Court in Richmond, Virginia wherein resided Ambrose and Miller.[5] At the time of their entry, the apartment was empty; the three, however, awaited the arrival of Ambrose and Miller. Ambrose, Miller and Smith were in Norfolk that night looking at apartments. Ambrose and Miller arrived back at 1514 Tifton Court at approximately 11:30 P.M., and apparently encountered Dean Beckford and Dennis in the apartment; Smith, who was Miller's cousin, arrived at the apartment just minutes thereafter.[6]

When Smith entered the apartment, there was an argument in progress between Dean Beckford and Miller over a silver .32 caliber Derringer gun. The gun apparently belonged to Miller, but when Smith entered the apartment, Dean Beckford was holding it in his hands. Smith described the nature of the argument as follows: "The nature of this argument was why Dasmond Miller brought this gun into the apartment. And Dasmond Miller said it's my gun, and I bought it with my license, and this is my apartment." *Commonwealth v. Dennis*, Criminal No. 89–221–F and 89–222–F (Trial Transcript, June 13, 1989).[7] After that, there was a "scuffling" between Dean Beckford and Miller, whereupon Smith "tried to break it up" until Dennis allegedly "pulled a gun out and put it to [Smith's] head and said, don't try." *Id.* At that point, Smith sat down and observed the remainder of the scuffle between Dean Beckford and Miller.

Eventually, Dean Beckford pushed Miller into the living room of the apartment, whereupon Miller, who was not aware that Dennis had a concealed firearm, turned his back to Dean Beckford, removed his jacket, and formally challenged Dean Beckford to a fight. With Miller's back turned, Dean Beckford nodded his head toward Dennis, "like give him a nodding of the head, and do what I told you." *Id.* at 22. Dennis then pulled out his gun and fired a shot at Miller, which sailed "a couple of inches over [Miller's] head." *Id.* at 23. When Miller realized that he was being fired upon, he turned around, only to be shot in the heart and killed by Dennis' next bullet.

Smith, upon seeing Miller (his cousin) shot, jumped to Miller's aid to prevent him from falling. Dennis then fired a shot at Smith, which struck Smith "next to the heart, and the bullet came through in the center of [his] back." *Id.* at 23. Smith, who, rather remarkably, survived this bullet to the chest, nonetheless played dead in order to dissuade Dennis' attention. According to Officer Woody's report, Smith next related that, at that point, "Sherman Ambrose attacked Claude Dennis." And, although Smith didn't witness the shooting, he heard a shot, and later found Ambrose lying in the kitchen with a bullet wound. According to Smith, he later learned from an ailing Ambrose that Dean Beckford shot Ambrose with Miller's .32 Derringer.

After the Ambrose shooting, Dennis "went to the front, to a room to look out a window to see if anybody heard a shot." *Id.* at 24. As Dennis was in the other room, Smith

---

4. Wiltshire, who is Beckford's brother-in-law, is also indicted as a non-capital defendant in this case.

5. The facts set forth in this section are based in part on the account of events provided by Delroy Smith, an expected Government witness in this case, to Detective C.T. Woody on December 8, 1990, and in his testimony for the State at Dennis' state court murder trial. The parties indicated at oral argument that the version of events related by Smith may be disputed at trial. At present, however, Smith's account constitutes the record before the Court because the parties have cited the transcript of Smith's trial testimony in their briefs. The Court finds that reference to Smith's version of events is helpful in deciding the motions at bar, but it does not intend to adopt Smith's testimony as the correct version of the events which it addresses. The Clerk will be directed to place the relevant portions of the Dennis trial transcript and the police report of Detective Woody in the file.

6. According to Smith, he drove to Norfolk with his girlfriend in a separate car from Ambrose and Miller. His arrival at 1514 Tifton Court was slightly delayed because he stopped to fill his car with gasoline upon arrival in Richmond.

7. Wiltshire, although in the apartment, was apparently upstairs during this entire incident.

gathered himself on one knee, armed himself with the gun he was carrying on his person, "and waited for [Dennis] to come back in." *Id.* When Dennis returned, he was greeted with the sight of Smith and his gun. Dennis, undoubtedly surprised, "ran toward the front door where [Beckford and Wiltshire] were, wanted to give them a warning like one of the guys is still alive." *Id.*

At this point, Dean Beckford and Wiltshire ran upstairs and eventually evacuated the apartment through a second floor window. Dennis, meanwhile, "turned around to start to fire on [Smith]." *Id.* A gunfight then ensued between Smith and Dennis. Smith hit Dennis "a couple of times," then changed positions into the kitchen and again exchanged fire with Dennis. Soon thereafter, Dennis ran upstairs and exited the apartment from the second floor. Smith then exited from the back sliding-glass kitchen door in search of much-needed medical attention for himself, Ambrose and Miller.[8]

## II. The "Sugar Bottom" Murders

The capital charges against Leonel Cazaco and Richard Thomas stem from their alleged involvement in the so-called "Sugar Bottom" Murders, which resulted in the deaths of Anthony Baylor, Marco Baylor and Anthony Merrit and the critical wounding of Charles Meekins on January 12, 1994 inside the location of 20 North 31st Street, Richmond, Virginia. *See* Superceding Indictment, Counts 10–12. The events leading up to these killings began in December, 1993, when Devon Dale Beckford[9], Dean Beckford's brother and co-leader of the Poison Clan, asked Anthony Baylor, allegedly a member of a rival drug organization, to sell "crack" cocaine for the "Poison Clan" from the location of 20 North 31st Street. Baylor refused the request. As the subsequent developments alleged in the Superseding Indictment attest, Devon Beckford is said not to have taken kindly to Baylor's rebuff.

Sometime thereafter in December, 1993, Devon Beckford allegedly instructed Cazaco and Thomas, and unindicted co-conspirators Peter Paul and Collin Joseph, to murder Anthony Baylor and any other persons inside the location of 20 North 31st Street due to Baylor's refusal to sell drugs on behalf of the "Poison Clan." Superseding Indictment, Count 3, Overt Act 43. Devon Beckford also allegedly instructed that the men were to take any money and/or drugs found at 20 North 31st Street at the time of the murder. *Id.*

On various occasions in January, 1994, Devon Beckford, Cazaco, Thomas, Paul and Joseph are said to have performed surveillance trips of 20 North 31st Street, in preparation for the murder of the occupants of this location. *Id.* at Count 3, Overt Act 46. On January 12, Devon Beckford gave Joseph a .41 Magnum caliber firearm which was subsequently given to Thomas for use during the commissioned murders. *Id.* at Count 3, Overt Act 47. On that same date, Cazaco, Thomas, Paul and Joseph allegedly traveled to 20 North 31st Street in order to murder that location's occupants. Thereafter, and acting upon their instructions from Devon Beckford, Cazaco and Thomas allegedly shot Anthony Baylor, Marco Baylor and Anthony Merrit to death and critically wounded Charles Meekins inside of 20 North 31st Street. *Id.* at Count 3, Overt Act 49. Although there were firearms being stored at that location, none of the occupants were armed at the time of their shootings. After the shootings, Devon Beckford, Cazaco, Thomas, Paul and Joseph allegedly divided among themselves the items taken from the residence (including a necklace, a ring and marijuana), and then proceeded to dispose of the evidence from the murders. *Id.* at Count 3, Overt Acts 50–54.

### DISCUSSION

In this case, the question whether the Government has a *Brady* obligation to disclose the requested information arises in a somewhat unusual posture. "In the ordinary *Brady* case, it is only after a judgment of convic-

8. Smith eventually stumbled to a convenience store and requested that an ambulance be sent for him and to 1514 Tifton Court.

9. Devon Beckford, who is named in the Superseding Indictment as a defendant in this case, remains a fugitive at large.

tion that a court reviews the failure of the prosecution to disclose material the defendant argues should have been admitted into evidence." *United States v. Cuthbertson*, 651 F.2d 189, 199 (3rd Cir.) (Seitz, C.J., concurring), *cert. denied sub nom. Cuthbertson v. CBS, Inc.*, 454 U.S. 1056, 102 S.Ct. 604, 70 L.Ed.2d 594 (1981). In this case, however, *Brady* issues have arisen before trial. Nonetheless, the same standards logically apply to both an initial decision to disclose and a postconviction determination whether nondisclosure deprived a defendant of his or her due process rights at trial. *See United States v. Agurs*, 427 U.S. 97, 107–08, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976) ("Logically the same standard must apply at both times.").

At the outset, it must be noted that the Court is not called upon, at this stage of the case, to determine whether certain evidence will be admitted at sentencing, or to decide which mitigating factors will be submitted to the jury at the penalty phase (if there is one). Rather, at present the Court must decide whether the defendants are entitled to the production of what they describe to be *Brady* evidence which would be material to the establishment of the (m)(8) and (m)(9) mitigating factors, or which would otherwise be material to mitigation argument.

■ Importantly, at this pre-trial stage, the defendants need only establish a "substantial basis for claiming" that a mitigating factor will apply at the penalty phase, in order to invoke the Government's obligation under *Brady* and its progeny to produce any evidence which is material to that mitigating factor. *United States v. Agurs*, 427 U.S. 97, 106, 96 S.Ct. 2392, 2398–99, 49 L.Ed.2d 342 (1976). That is because, under *Brady* and its progeny, constitutional error results from the suppression by the Government of favorable evidence that is material. Evidence relevant to a statutory mitigating factor would certainly be, for the defendant, "favorable" evidence pertaining to punishment in that it may justify a sentence of life imprisonment as opposed to death. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197–98, 10 L.Ed.2d 215 (1963). And, such evidence would be "material" in that, if there is a

"substantial basis for claiming," *Agurs*, 427 U.S. at 106, 96 S.Ct. at 2399, that the evidence will establish a statutory mitigating factor, there is a "reasonable probability" that its disclosure would affect the result of the sentencing proceedings. *See Kyles v. Whitley*, 514 U.S. 419, 431–37, 115 S.Ct. 1555, 1565–67, 131 L.Ed.2d 490 (1995); *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383–84, 87 L.Ed.2d 481 (1985); *United States v. Agurs*, 427 U.S. at 106, 96 S.Ct. at 2399 ("[I]f the subject matter of such a request is material, or indeed *if a substantial basis for claiming materiality exists*, it is reasonable to require the prosecutor to respond . . .") (emphasis added).

■ The fact that it is not certain whether the requested evidence will ultimately establish a mitigating factor is of no import. For, "the constitutional duty [under *Brady]* is triggered by the *potential impact of favorable but undisclosed evidence. [Brady]*'s touchstone of materiality is a 'reasonable probability' of a different result." *Kyles v. Whitley*, 514 U.S. at 434, 115 S.Ct. at 1566 (emphasis added).

Although, at this time, the Court need not determine whether the mitigators set forth in § 848(m)(8) and (9) are applicable in this case, resolution of the *Brady* issues presented here turns to a large extent on the interpretation of those mitigating factors. These two sub-sections have not been addressed substantively by any reported federal court opinions. Nor is there any legislative history which sheds light on the proper construction of these mitigating factors. There is, however, some pertinent state statutory and common law which guides the inquiry with respect to the application of subsections (m)(8) and (m)(9) The two provisions will be discussed in turn.

## I. Mitigating Factor § 848(m)(8)

■ Under 21 U.S.C. § 848(m)(8), in determining whether a sentence of death is to be imposed on a defendant, the finder of fact shall consider as a mitigating factor:

(8) Another defendant or defendants, equally culpable in the crime, will not be punished by death.

With respect to mitigating factor (m)(8), the defendants seek, pursuant to *Brady*, any evidence in the possession of the Government which relates to all criminal acts of all co-defendants and co-conspirators, in furtherance of or in connection with the Poison Clan CCE, drug conspiracy, and the racketeering activity charged in the Superseding Indictment. The United States asserts that the defendants' *Brady* request reaches far beyond the ambit of (m)(8). The Court concurs with the Government's position.

## A. Interpretation of § 848(m)(8)

The proper construction of subsection (m)(8) turns on the meaning of four phrases found within the single sentence that is subsection (m)(8): (a) "defendant or defendants;" (b) "equally culpable;" (c) "in the crime;" and (d) "will not be punished by death." These four phrases, therefore, require analysis.

### 1. "defendant or defendants"

The explicit language of Section 848(m)(8) instructs the jury to consider as a mitigating circumstance only the equal culpability of another *"defendant* or *defendants"* who will not be punished by death. For reasons known only to the statute's drafters, the provision contains the term "defendant" rather than "co-conspirator." This is significant in this case in two respects. First, at least two *unindicted co-conspirators,* who, of course, are not defendants in this case, are alleged to have committed murders in furtherance of the criminal enterprise in the Superseding Indictment.[10] Second, unindicted co-conspirators Peter Paul and Collin Joseph each participated, to some extent, in the events which resulted in the killings of Anthony and Marco Baylor and Anthony Merrit. If the (m)(8) mitigating factor were to be limited strictly to the consideration of sentences for equally culpable *charged defendants,* the capital defendants in this case would be unable to argue this mitigating factor with respect to the aforementioned uncharged co-conspirators.

The defendants, armed with no authority or other legal argument, assert that: "Although § 848(m)(8) only refers to defendants 'equally culpable in the crime,' the defendant would be severely prejudiced if evidence of a co-conspirator's criminal activity which indicated he was equally culpable in the crime, and did not receive the death penalty, was not provided to the defense." Although the defendants may be prejudiced to some extent without pre-trial discovery of the evidence respecting unindicted co-conspirators' conduct, that by no means provides a sufficient basis upon which to grant their *Brady* motions. For, to be discoverable under *Brady,* the requested evidence must be both favorable and material to guilt or punishment. Here, the materiality of the requested evidence hinges on whether it is relevant to the proof of mitigating factor (m)(8). And, the defendants' bald assertion that they will suffer some "prejudice" if (m)(8) applies only to defendants does little to overcome the explicit language of the statute. The Government, however, seems to have conceded in its papers that (m)(8) applies to uncharged co-conspirators by stating that the mitigator is potentially applicable to "all participants" in the capital murders including Paul and Joseph. Government's Response at 2–3.

■ The Court finds that Section 848(m)(8) is not limited solely to indicted defendants, but pertains to uncharged co-conspirators as well. There is strong support for this view in the case law. Although no federal court has yet undertaken to interpret what "defendant" means in § 848(m)(8), courts in both the federal and state systems have addressed similar so-called "disparate treatment" mitigating factors employed in state death penalty schemes.

The bulk of the pertinent state case law comes from the Supreme Court of Florida. As the Supreme Court of the United States has recognized, the Supreme Court of Florida has established the disparate treatment of a codefendant or accomplice as a nonstatutory mitigating factor in the capital sentencing

10. In the Superseding Indictment, uncharged co-conspirator Phillip Pierre is alleged to have murdered co-conspirator, and founder of the Poison Clan organization, George Chang in January of 1989. And, unindicted co-conspirator Tracy Lavache pled guilty to the September, 1989 murder of Mark Teeter.

calculus. *See Parker v. Dugger,* 498 U.S. 308, 315, 111 S.Ct. 731, 736, 112 L.Ed.2d 812 (1991); *see also Bolender v. Singletary,* 16 F.3d 1547, 1566 n. 27 (11th Cir.) ("Under Florida law, ... the disparate treatment of a codefendant can constitute a nonstatutory mitigating circumstance in cases where the defendants are equally culpable."), *cert. denied,* 513 U.S. 1022, 115 S.Ct. 589, 130 L.Ed.2d 502 (1994). Significantly, the Supreme Court of Florida has not limited the scope of Florida's nonstatutory mitigating factor to situations where the relative culpability determination involves two charged codefendants. In *Palmes v. Wainwright,* 460 So.2d 362 (Fla.1984), the defendant, who was sentenced to death, argued that the grant of immunity to his uncharged accomplice in a capital murder, in exchange for her testimony, was both a mitigating factor for sentencing and violative of the Eighth Amendment principle of proportionality. The Supreme Court of Florida rejected the defendant's constitutional argument, but recognized that the disparate sentencing treatment could establish a mitigating factor. *Id.* at 364 ("Disparate treatment of accomplices which may be a ground of mitigation is an entirely separate matter."). The court held, however, that the mitigating factor was not proven in that case because the facts belied a claim of equal culpability between the defendant and the uncharged co-conspirator.

Similarly, the district court in *McLain v. Calderon,* 1995 WL 769176 (C.D.Cal.1995), without comment, made no distinction between charged and uncharged accomplices with respect to the applicability of the nonstatutory "disparate treatment" mitigating factor. In *McLain,* the court held that the defendant was entitled to present as a mitigating factor at sentencing evidence both that the defendant's uncharged accomplice to a capital murder was granted immunity by the State in exchange for his testimony; and that a second accomplice, who was charged with the crime, was underage and thus ineligible for the death penalty by statute.

Moreover, a review of the relevant decisional law indicates that courts rather universally use terms such as "defendant," "accomplice," and "co-conspirator" interchangeably when discussing the "disparate treatment" mitigating factor. A number of courts, including the Supreme Court of the United States and the Supreme Court of Florida, have used various terms interchangeably in discussing the import of state mitigating factors similar to (m)(8). *See, e.g. Parker v. Dugger,* 498 U.S. at 314–16, 111 S.Ct. at 735–37 (using the terms "defendant," "perpetrator of the crime," and "accomplice" in discussing the scope of Florida's disparate treatment mitigator); *Frey v. Fulcomer,* 974 F.2d 348, 365–66 n. 22 (3rd Cir.1992) (using terms "co-defendant" and "accomplice" interchangeably in assessing whether the disparate treatment of accomplices was admissible as mitigating evidence under the miscellaneous mitigating circumstances provision in the Pennsylvania death penalty statute), *cert. denied,* 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993); *McLain v. Calderon,* 1995 WL 769176 at *72–73 (using terms "accomplice" and "defendant" in holding that the Eighth Amendment requires the admission of evidence of a lenient sentence for a co-conspirator); *Hoffman v. State of Florida,* 474 So.2d 1178, 1181–1182 (Fla.1985) (using the terms "co-conspirator," "accomplice," and "co-defendant" in discussing scope of Florida's mitigator) Given the rather common interchanging of these terms by the courts, the use of the term "defendant" by Congress in (m)(8) cannot be construed necessarily to foreclose that provision's application to other accomplices or uncharged co-conspirators.

Furthermore, the majority of state and federal courts which have addressed a state law disparate treatment mitigator similar to (m)(8) have encountered the issue in the context of co-defendants who are tried individually before separate juries. *See, e.g. Parker v. Dugger,* 498 U.S. 308, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991); *Mak v. Blodgett,* 970 F.2d 614 (9th Cir.1992), *cert. denied sub nom. Blodgett v. Kwan Fai Mak,* 507 U.S. 951, 113 S.Ct. 1363, 122 L.Ed.2d 742 (1993); *Hoffman v. State of Florida,* 474 So.2d 1178 (Fla.1985); *State v. McIlvoy,* 629 S.W.2d 333 (Mo.1982); *People v. Gleckler,* 82 Ill.2d 145, 44 Ill.Dec. 483, 411 N.E.2d 849 (1980). In this context, similar to that in which the allegedly "equally culpable" accomplice is *uncharged,* the sentencing jury is faced with the

task of determining the relative culpability of the defendant and an accomplice not prosecuted before it. Therefore, courts have regularly considered it appropriate to apply the "disparate treatment" mitigating factor to situations in which one accomplice to a crime is not charged before the sentencing jury.

In sum, although there is no authority directly on point, the decisional law which informs the inquiry here as to the proper interpretation of (m)(8) strongly supports the proposition that the phrase "defendant or defendants" incorporates uncharged co-conspirators or accomplices. Indeed, this is as it should be. For the only difference between a charged co-defendant like Wiltshire and uncharged accomplices such as Paul and Joseph lies in the decision of the Government not to charge Paul and Joseph in the Superseding Indictment in this case. And, this distinction is of no import in view of the goals of proportionality, equity, and fairness which underlie the mitigating factor set forth in (m)(8). Therefore, the Court finds that the term "defendant" in Section 848(m)(8) includes charged and uncharged co-conspirators alike.

### 2. "in the crime"

█ Perhaps the most significant issue in the interpretation of (m)(8) is the proper meaning of the phrase "in the crime." The defendants, citing no authority, assert that the "crime" referred to in subsection (m)(8) is the CCE or the drug conspiracy punishable under 21 U.S.C. § 841(b)(1)(A), of which the charged murders are alleged to be "in furtherance." Under this theory, a defendant would be able to argue in mitigation of the death penalty that any one of his charged or uncharged co-conspirators who "will not be punished by death" was "equally culpable" in the underlying CCE. The Government, also citing no authority, argues that the term "crime" refers only to the capital murder itself, as opposed to the underlying drug trafficking felony. In the Government's view of (m)(8), only conduct of other accomplices in *the murders* charged under Section 848(e)(1) would be relevant mitigating evidence. The Court agrees. The Court finds, based on the plain meaning of the statutory language in (m)(8) and on the pertinent case law, that "in the crime" refers only to the capital murder charged under Section 848(e)(1).

The plain language of Section 848 clearly supports the proposition that the "crime" referred to in (m)(8) is the capital murder charged under 848(e)(1). Section 848(e)(1) sets forth four specific crimes which are punishable by death: (1) intentional murder in furtherance of a CCE as defined in § 848(c), 21 U.S.C. § 848(e)(1)(A); (2) intentional murder in furtherance of a drug trafficking offense punishable under 21 U.S.C. § 841(b)(1)(A), *id.* (3) intentional murder by one engaging in a drug offense punishable under 21 U.S.C. § 960(b)(1), *id.;* and (4) intentional killing of any Federal, State or local law enforcement officer during the commission of a felony, 21 U.S.C. § 848(e)(1)(B).

The remainder of Section 848 sets forth the procedures to be employed when the Government seeks to impose the death penalty for a crime defined in Section 848(e)(1). Many of the subsections which articulate these death penalty procedures refer back to the four capital offenses set forth in subsection (e). *See, e.g.* 21 U.S.C. §§ 848(g) ("A person shall be subjected to the penalty of death for *any offense under this section* only if a hearing is held in accordance with this section.") (emphasis added); 848(h)(1) ("Whenever the Government intends to seek the death penalty *for an offense under this section* for which one of the sentences provided is death ... ") (emphasis added); 848(i)(1) ("when ... the defendant is found guilty of or pleads guilty to an *offense under subsection (e)* of this section ...") (emphasis added); 848(j) ("when a defendant is found guilty of or pleads guilty to *an offense under subsection (e)* of this section ...") (emphasis added).

Similarly, the phrase "in the crime" in (m)(8) refers back to one of the four capital crimes defined in subsection (e)(1)(A) and (B). This is necessarily the case, because the four crimes defined in subsection (e)(1) are *the only crimes* for which a defendant can be death-eligible under Section 848, and are thus the only crimes for which there can be a mitigating factor. Although the defendants would like (m)(8) to read "in the indictment,"

"in the conspiracy," or "in the CCE," it simply does not.

Not surprisingly, in the only two reported federal cases in which the court submitted the (m)(8) mitigator to the jury with respect to a defendant charged with capital murder in furtherance of a CCE and a drug conspiracy, the courts focused on the relative culpability of the co-conspirators with respect to the *murders*, as opposed to the underlying drug trafficking activities. In *United States v. Chandler*, 996 F.2d 1073, 1087–88, 1093–94 (11th Cir.1993), the defendant was convicted of drug trafficking conspiracy, participation in a CCE, and murder in furtherance of that drug trafficking enterprise. The Court of Appeals noted with approval that the district court permitted the defendant to argue at the penalty phase under (m)(8) the fact that neither of his accomplices in the murder would face the death penalty due to plea agreements they reached with the Government. The sanctioned argument focused solely on the relative culpability of the participants in the murder, as opposed to any participation in the underlying CCE. *Id.*

Similarly, in *United States v. Flores*, 63 F.3d 1342, 1367 (5th Cir.1995), *cert. denied*, —— U.S. ——, 117 S.Ct. 87, 136 L.Ed.2d 43 (1996), the district court submitted the (m)(8) statutory mitigator to the jury, which indeed found that other defendants who were equally culpable would not be punished by death. Although the Fifth Circuit did not set forth the basis for the jury's finding, the opinion suggests strongly that the jury's decision was based on the fact that the death-eligible appellant's chief accomplice in the capital murders, the "triggerman" in many of the murders, received a term of life imprisonment. Although neither court explicitly addressed the issue, a fair reading of *Chandler* and *Flores* is that "in the crime" in Section 848(m)(8) refers to the capital murder charged under Section 848(e)(1), and not to the underlying drug trafficking offense.

Considering the plain language of the statute and the limited decisional authority, it appears that the defendants' *Brady* request in this case is significantly overbroad. The defendants seek production, pursuant to mitigating factor (m)(8), of any material in the possession of the Government which relates to *all criminal acts* of *all co-defendants and co-conspirators*, in furtherance of or in connection with the *drug conspiracy, the continuing criminal enterprise, and the racketeering activity* charged in the Superseding Indictment. The Court finds, however, that the phrase "in the crime" limits the relative culpability calculus in (m)(8) to participants in the capital murders charged under § 848(e)(1). Therefore, the defendants would be entitled to, at most, production of any material in the possession of the Government which relates to the participation of Wiltshire, Paul, and Joseph in the Section 848(e)(1)(A) murders alleged in Counts 5, 6, and 10–12 of the Superseding Indictment.

### 3. "will not be punished by death"

Section 848(m)(8) instructs the jury to consider as a mitigating circumstance whether any equally culpable "defendant or defendants" "will not be punished by death." The (m)(8) mitigating factor implicates two distinct decisions in the criminal adjudication process: (1) the Government's charging decision; and (2) the decision whether to impose the death penalty on a defendant who is convicted of a capital crime. Thus, where two individuals are equally culpable of a capital crime under Section 848(e)(1), (m)(8) may apply where the Government seeks the death penalty against only one of those perpetrators, or where both are convicted of the crime and the jury sentences only one perpetrator to death. In either event, the defendant facing the death penalty is entitled to the benefit of the (m)(8) mitigator in opposing the death penalty as to him or her.

At this pre-trial stage of the case, of course, only the Government's charging decision is relevant. Here, one defendant who was present during, and possibly involved in, the Ambrose and Miller murders, Wiltshire, has not been charged with capital murder under § 848(e)(1) and will thus not be punished by death. Furthermore, Paul and Joseph, who participated to some extent in the killings of Anthony and Marco Baylor and Anthony Merrit, have not been charged in the Superseding Indictment at all. Thus, the (m)(8) mitigating factor would be applicable, if at all, to only Wiltshire, Paul and Joseph.

#### 4. "equally culpable"

The (m)(8) mitigating factor is only implicated where a capital defendant's co-conspirator, who will not be punished by death, is "equally culpable" in the capital crime. The phrase "equally culpable" is, of course, difficult to define precisely, but it carries with it the notions of equal blameworthiness or equal participation "in the crime." It is not as important here, however, for the Court to define "equally culpable" as it is for the Court to emphasize who it is that must make this culpability determination—the jury. Where there is evidence that another "defendant or defendants" who will not be punished by death may be deemed "equally culpable," this mitigating factor must be submitted to the *jury* to make this culpability determination.

The Government appears to have overlooked the jury's role in determining relative culpability under Section 848(m)(8). In its papers, the Government acknowledges that unindicted co-conspirators Collin Joseph and Peter Paul participated to some extent in the Sugar Bottom murders.[11] The Government concludes, however: "While co-conspirators Collin Joseph and Peter Paul participated in the murders, there is no evidence in the Government's possession that indicates that they were 'equally culpable' to defendants [Devon] Beckford, Thomas and Cazaco. Consequently, there is no *Brady* material under § 848(m)(8) for defendant Thomas." Government's Response at 3. Under its theory, then, it is up to the Government, as opposed to the jury, to assess the relative culpability of the defendants.

The Government, of course, does have some obligation under *Brady* and its progeny to assess the character of certain evidence—*i.e.*, its "favorability" and "materiality" to the defense. That is a far cry, however, from entitling the Government to make the ultimate decision as to whether a mitigating circumstance applies to a specific capital charge, whether that mitigating factor should be submitted to the jury for its consideration, and thus, whether the defendant is entitled to *Brady* discovery as to that mitigating factor. The proper application of (m)(8) should leave the ultimate determination of relative culpability to the jury, not the Government, and the determination of the nature and extent of the Government's *Brady* obligations has now fallen squarely on the shoulders of the Court.

### B. Application of § 848(m)(8) to This Case

Considering the record presented here, the Court finds that the defendants have set forth a "substantial basis for claiming," *Agurs*, 427 U.S. at 106, 96 S.Ct. at 2399, that the evidence will establish the potential applicability of the (m)(8) mitigating factor with respect to: (1) Wiltshire's involvement in the Ambrose and Miller murders; and (2) Paul's and Joseph's involvement in the Sugar Bottom murders. Therefore, the defendants are entitled, under *Brady* and its progeny, to production of any evidence in the Government's possession which relates to that conduct of Wiltshire, Paul and Joseph, because there is a "reasonable probability" that the evidence will affect the result of the sentencing proceedings. *See Kyles v. Whitley*, 514 U.S. at 431–37, 115 S.Ct. at 1565–67; *United States v. Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383–84; *United States v. Agurs*, 427 U.S. at 106, 96 S.Ct. at 2399 ("[I]f the subject matter of such a request is material, or indeed *if a substantial basis for claiming materiality exists*, it is reasonable to require the prosecutor to respond . . .") (emphasis added).

### II. Mitigating Factor § 848(m)(9)

Under 21 U.S.C. § 848(m), in determining whether a sentence of death is to be imposed on a defendant, the finder of fact shall consider as a mitigating factor:

(9) The victim consented to the criminal conduct that resulted in the victim's death.

With respect to mitigating factor (m)(9), the defendants seek, pursuant to *Brady*, any information in the possession of the Government which indicates that any alleged murder victim was engaged in criminal activities, specifically drug-related transactions or ac-

---

11. Moreover, although it is not alleged in the Superseding Indictment, it appears that Oliver Wiltshire was at least present at the murders of Ambrose and Miller.

tivities, at the time of his death. The defendants, without benefit of authority, posit a broad interpretation of (m)(9) which would equate a victim's participation in the drug trade with "consent" to the criminal conduct which resulted in the victim's death:

> If the United States possesses information indicating that any of the victims were engaged in the business of selling or distributing narcotics or controlled substances, defendant would assert that such business is inherently and historically a dangerous business, marked by the presence of weapons and with a long history of violence, including assault, robbery and murder.

Thomas' Response to the United States' Supplemental Memorandum. Regarding *Brady* and *Kyles* Material of Victim's Conduct and Mitigation Issue 21 U.S.C. § 848(m)(9) at 5. The United States, citing only one case from the Supreme Court of Florida, asserts that the scope of (m)(9) is significantly more circumscribed than suggested by the defendants. The Court concurs with the Government's position.

### A. Interpretation of § 848(m)(9)

The proper construction of subsection (m)(9) turns on the meaning of two phrases found within the single sentence that is subsection (m)(9): (a) "the victim consented to;" and (b) "the criminal conduct that resulted in the victim's death." They, therefore, will be considered in turn.

#### 1. "victim consent"

The construction of Section 848(m)(9) turns in part on the meaning of "consent" as that term is used in the statute. Black's Law Dictionary provides a widely-accepted definition of "consent."

> **Consent.** A concurrence of wills. Voluntarily yielding the will to the proposition of another; acquiescence or compliance therewith. Agreement; approval; permission; the act or result of coming into harmony or accord. Consent is an act or reason, accompanied with deliberation, the mind weighing as in a balance the good or evil on each side. It means voluntary agreement by a person in the possession and exercise of sufficient mental capacity

to make an intelligent choice to do something proposed by another. It supposes a physical power to act, amoral power of acting, and a serious, determined, and free use of these powers.... Willingness in fact that an act or an invasion of an interest shall take place.

BLACK'S LAW DICTIONARY 305 (6th ed.1990) (*citing* RESTATEMENT (SECOND) OF TORTS § 10A (1977)). It hardly needs citation that the law recognizes two forms of consent: actual (or express) consent and implied consent. *Actual consent* is "[t]hat directly given .. It is positive, direct, unequivocal consent, requiring no inference or implication to supply its meaning." *Id. Implied consent* is that "which raises a presumption or inference that the consent has been given. An inference arising from a course of conduct or relationship between the partes, in which there is mutual acquiescence or a lack of objection under circumstances signifying assent." *Id.* Of course, because it generally will be highly unlikely that a homicide victim *actually consented* to being killed, the relevant inquiry with respect to Section 848(m)(9) ordinarily will be whether the victim *impliedly consented* to the criminal conduct which resulted in his death.

Neither the parties nor the Court have found any federal case law or legislative history which addresses the import of the consent component of Section 848(m)(9). However, there exists a pertinent body of state case law which stems from the Model Penal Code's similar mitigating factor in its model death penalty statute. Section 210.6(4)(c) of the Model Penal Code, the so-called "victim consent" provision, provides that a mitigating factor shall be that: "The victim was a participant in the defendants homicidal conduct or consented to the homicidal act." MODEL PENAL CODE § 210.6(4)(c) (American Law Institute 1962). At least eighteen states have enacted similar statutory mitigating factors modeled after this provision of the Model Penal Code.

Four state statutes mirror precisely the language found in the Model Penal Code. *See* Cal.Penal Code § 190.3(e) (West 1996); Ill. Ann. Stat. ch. 720, § 5/9–1(c)(3) (Smith–Hurd Supp.1993); *N.C.* Gen.Stat. § 15A–2000 (f)(3)

(1983); Pa.Stat.Ann. 42 § 9711(e)(6) (Purdon Supp.1993). Other state statutes simply omit the term "homicidal" from the Model Penal Code's mitigator. *See, e.g.* Fla.Stat.Ann. § 921.141(6)(c) (West 1985) (same) ("The victim was a participant in the defendant's conduct or consented to the act."); Ky.Rev.Stat. Ann. § 532.025(2)(b)(3) (Michie/Bobbs–Merrill 1990) (same); Miss.Code Ann. § 99–19–101(6)(c) (Supp.1993) (same); Mont.Code Ann. § 46–18–304(5) (1987) (same); Mo.Ann. Stat. § 565.032(3)(3) (Supp.1993) (same); Neb.Rev.Stat. § 29–2523(2)(f) (1989) (same); S.C.Code Ann. § 16–3–20(C)(b)(3) (Law.Co-op.Supp.1993) (same); Tenn.Code Ann. § 39–13–204(j)(3) (1991) (same); Va.Code Ann. § 19.2–264.4(B)(iii) (1990) (same); Wyo.Stat. § 6–2–102(j)(3) (1991) (same). Still other states have enacted slightly modified versions of the Model Penal Code mitigator. *See, e.g.* Ala.Code § 13A–5–51(3) ("The victim was a participant in the defendant's conduct or consented to it."); Ind.Code Ann. § 35–50–2–9(c)(3) (Burns 1993) ("The victim was a participant in or consented to the defendant's conduct."); Md.Ann.Code Art. 27, § 413(g)(2) (Supp.1993) ("The victim was a participant in the defendant's conduct or consented to the act which caused the victim's death."); Nev.Rev.Stat.Ann. § 200.035(3) (Michie 1992) ("The victim was a participant in the defendant's criminal conduct or consented to the act.").

■ Although the language in Section 848(m)(9) is similar to that in Section 210.6(4)(c) of the Model Penal Code and its derivative state statutes, the federal provision is significantly distinguishable from its state counterparts in at least one important respect: in enacting (m)(9), Congress limited the mitigating factor set forth therein to situations where the victim *consents* to the defendant's criminal conduct which resulted in his death, and omitted any reference to *participation* by the victim in the defendant's criminal conduct. This omission by the statute's drafters, who presumably were aware of the Model Penal Code mitigator and its state progeny, must be heeded by the courts. Therefore, (m)(9) is significantly more narrow than the mitigating factors employed in the state death penalty schemes referenced above.

Nonetheless, because there is no federal law pertaining to Section 848(m)(9), the Model Penal Code and state decisional law interpreting similar mitigating circumstances are instructive. And, because the "victim consent" mitigator has as its origin Section 210.6(4)(c) of the Model Penal Code, the commentary note to that model provision is of special importance. The Code's commentary posits a *strict* and *narrow* application of the "victim consent" mitigator:

> *Paragraph (c) addresses the case where the victim is partially responsible for his own death. This circumstance obtains chiefly in two kinds of situations.* First, there are occasions in which the defendant and his victim are engaged jointly in an activity highly dangerous to each. If each person's participation depends upon the cooperation of the other, a murder conviction may lie for the death of one actor, even though both share responsibility. An example may be the case of Russian roulette, at least where the defendant actually fires the shot that kills his partner. A second situation within the scope of Paragraph (a) is the true mercy killing. There the defendant's homicidal act may not have occurred had the victim not consented to it. In either of these contexts, the conduct of the victim in bringing about his own death deserves consideration as a mitigating factor in assigning a death sentence.

Model Penal Code § 210.6(4)(c) commentaries at 140–141 (emphasis added). The first example, of course, is a classic illustration of implied consent. The second is clearly actual consent.

In accordance, the state courts which have addressed the issue strictly and narrowly have construed the "victim consent" mitigating factor. For example, in *Huffington v. State of Maryland,* 304 Md. 559, 500 A.2d 272 (1985), *cert. denied,* 478 U.S. 1023, 106 S.Ct. 3315, 92 L.Ed.2d 745 (1986), the Court of Appeals of Maryland (the state's highest court) rejected the defendant's argument that he was entitled, as a matter of law, to this mitigating factor. In *Huffington,* the victim was a co-conspirator of the defendant in a drug-purchasing transaction. The victim

accompanied the defendant to a rural area in the middle of the night to purchase drugs. As the two exited their car, the defendant shot and killed the victim in his back. The defendant argued that "[a]ccompanying known drug dealers to a rural area in the middle of the night has much in common with 'Russian roulette'—the chance of becoming a victim of crime in that circumstance is probably better than one in six." *Id.* 500 A.2d at 283–84. The Court of Appeals, strictly interpreting the "victim consent" mitigator, rejected the defendant's claim that the victim participated in, or consented to, his criminal conduct. *Id.*

Similarly, the Court of Criminal Appeals of Alabama, in *Dill v. State,* 600 So.2d 343 (Ala.Crim.App.1991), *aff'd, Ex parte Dill,* 600 So.2d 372 (Ala.1992), *and cert. denied,* 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993), also rejected the application of the mitigator in the context of a drug offense. In *Dill,* the victim and the defendant were riding together in a car for the purpose of selling cocaine to others. The victim, however, had refused to "front" the defendant cocaine; as a result, the defendant shot and killed the victim. The defendant alleged that the victim was a participant in his criminal activity, and thus that the "victim consent" mitigating factor applied. The Court of Criminal Appeals of Alabama rejected this argument:

> The appellant argues that the trial court erred in failing to find that Leon Shaw was "a participant in the defendant's conduct ..." The appellant's argument that [the victim's] refusal to give him cocaine made [the victim] a participant in the appellant's conduct has no merit and is not a reasonable interpretation of the statute.... Furthermore, the appellant seems to argue that because Leon Shaw was a drug dealer, the appellant should not have received the death penalty. This argument likewise has no merit.

*Id.* at 364.

The Supreme Court of Florida recently has espoused a narrow interpretation of the concept of "victim consent" under Florida's statutory mitigating factor. In *Wuornos v. State,* 676 So.2d 972 (Fla.), *cert. denied,* ——

U.S. ——, 117 S.Ct. 491, 136 L.Ed.2d 384 (1996), the defendant was a prostitute who murdered one of her "clients" during a prostitution transaction. The transaction was to take place in an isolated wooded area where the client showed the defendant a false police badge and said he could arrest her but would not do so if she had sex with him for free. The defendant challenged the veracity of the client's claim, and she pulled out a gun; a struggle ensued during which the defendant shot the client/victim four times. The defendant sought a finding of the mitigating factor that the "victim was a participant in the defendant's conduct or consented to the act" based on the claim that, by seeking the services of a prostitute, the victim therefore "assumed the risk" of suffering bodily harm. The *Wuornos* Court rejected the application of the "victim consent" mitigator to these circumstances:

> We find that the theory advanced by Wuornos is insufficient as a matter of law to establish this particular mitigating factor.... It would be absurd to construe this language as applying whenever victims have engaged in some unlawful or even dangerous transaction that merely provided the killer a better opportunity to commit murder, which the victim did not intend. *What the language plainly means is that the victim has knowingly and voluntarily participated with the killer in some transaction that in and of itself would be likely to result in the victim's death, viewed from the perspective of a reasonable person.* An example would be two persons participating in a duel, with one being killed as a result. *The statute does not encompass situations in which the killer surprises the victim with deadly force, as happened here under any construction of the facts.*

*Id.* at 975 (emphasis added).

The most recent case addressing the "victim consent" mitigator is *State v. Larry,* 345 N.C. 497, 481 S.E.2d 907 (1997). In *Larry,* the murder victim was an off-duty police officer who was a customer in a grocery store when an armed robbery took place. After the robbery, the defendant ran from the store, and the off-duty officer gave chase.

When the officer caught up with the defendant, a struggle ensued during which the defendant fatally shot the officer with a handgun. The defendant argued that the "victim consent" mitigator applied because in attempting to detain the defendant, the victim voluntarily injected himself into the situation that resulted in his death. The Supreme Court of North Carolina disagreed, stating:

> Obviously the victim had nothing to do with the armed robbery; he merely attempted to apprehend defendant when defendant fled. Therefore, the evidence did not support submission of the ["victim consent"] mitigating circumstance.

*Id.* at 922.

Other state courts have also strictly construed the consent, or participation, element of the "victim consent" mitigating factor. *See, e.g., State of Tennessee v. Collier,* 1997 WL 9722 at *7 (Tenn.Crim.App.1997) (finding that the "victim consent" mitigator did not apply where defendant was allegedly provoked to murder the mother of his son as a result of her boyfriend's threats that he would never see his son again; the court held: "These facts simply do not support any 'participation' or 'consent' on behalf of [the victim]."); *State v. Ryan,* 248 Neb. 405, 534 N.W.2d 766, 784–85 (1995) ("victim consent" mitigator inapplicable where victim was a member of a cult group and allegedly consented initially to corporal punishment inflicted by the group leader which resulted in his death by torture).

The narrow construction of the "victim consent" mitigating factor espoused by the state courts, and reflected in the Model Penal Code, is persuasive. This narrow construction is especially appropriate with respect to Section 848(m)(9) because the federal provision does not include the victim's *participation* in the defendant's criminal conduct as a mitigating factor. Instead, the statute focuses solely on whether the victim *consented* to that criminal conduct.

■ For this reason alone, the defendants' *Brady* motion pursuant to Section 848(m)(9) is overbroad. The defendants seek the production of any information in the possession of the Government which indicates that any alleged murder victim *was engaged in* criminal activities, specifically drug-related transactions or activities, at the time of his death. The defendants' focus on whether the victims were "engaged in" criminal activity is misplaced, however. For, unlike the Model Penal Code and its statutory progeny, under (m)(9), the victim's participation in the criminal activity which resulted in his death is not itself sufficient to establish the mitigating factor. Thus, (m)(9) is not applicable where a victim merely engaged in, or participated in, illegal activity with a defendant. Rather, it is necessary that the victim *"consent"* to the defendant's criminal activity.[12] Before assessing whether the victims in this case manifested the requisite consent, it is necessary to construe the second component of the (m)(9) mitigating factor.

## 2. "the criminal conduct that resulted in the victim's death"

■ The defendants assert that, pursuant to *Brady* and its progeny, Section 848(m)(9) affords them the opportunity to have produced all evidence that the murder victims were engaged in *any criminal activity.* However, (m)(9) strictly limits the criminal activity which is relevant to that mitigating factor. A victim's consent to criminal activity is only relevant under (m)(9) if it pertains to the "criminal conduct that resulted in the victim's death." Based on the plain language of the statute, the Court construes this phrase to limit the relevant "criminal conduct" to that which *caused* the victim's death. This interpretation is strongly supported by the pertinent state case law and by the commentaries to the Model Penal Code.[13]

---

12. It should be noted that in some cases, the victim's participation in the criminal conduct which resulted in his or her death may establish implied consent under Section 848(m)(9).

13. It should be noted that the Model Penal Code's "victim consent" mitigating factor uses the term "act" rather than "criminal conduct" which is found in Section 848(m)(9). It is arguable that "criminal conduct" is broader than the term "act." The defendants, however, did not advance this argument, and the Court finds the distinction in phraseology to be of no import.

The state courts have uniformly circumscribed the criminal act or conduct relevant under the "victim consent" mitigating factor to that which caused the victim's death. For example, in *Huffington v. Maryland,* the Maryland Court of Appeals rejected the defendant's argument that the "victim consent" mitigator was applicable because "[a]bsent the victim's participation in this illegal [drug] activity, there would have been no murder." 500 A.2d at 284. The court reasoned:

> According to the testimony Hudson [the victim] and Huffington [the defendant] were joint participants and co-conspirators in an alleged drug sale. *The conduct which caused Hudson's death related to Huffington's carrying and concealing a loaded pistol and the firing of such pistol at Hudson's back. It is beyond the stretch of anyone's imagination to say that Hudson participated in this conduct.*

*Id.* (emphasis added). Thus, the *Huffington* Court narrowly construed the "victim consent" mitigator to apply only to the defendant's criminal conduct which caused the victim's death, as opposed to the entire course of criminal conduct out of which arose the fatal event.

Similarly, in *Dill v. State,* the Court of Criminal Appeals of Alabama found the victim's participation in the underlying crime irrelevant for purposes of determining the applicability of the "victim consent" mitigator, stating that:

> The appellant's argument that [the victim's] refusal to give him cocaine made [the victim] a participant in the appellant's conduct has no merit and is not a reasonable interpretation of the statute. *Section 13A-5-51(3) contemplates a situation wherein the victim participated in the capital crime with the defendant.*

600 So.2d at 364 (emphasis added). Under *Dill,* then, the relevant conduct which must be consented to, or participated in, is the act constituting the capital offense itself—*i.e.,* the act which is the cause of the victim's death.

Moreover, the Supreme Court of Florida, in *Wuornos v. State,* held that the victim's participation in, and consent to, a prostitution transaction did not warrant a finding that he consented to the criminal act which resulted in this death for purposes of the "victim consent" mitigator. 676 So.2d at 975. Rather, the court emphasized that, in order for the mitigating factor to apply, the victim must consent to (or participate in) the deadly conduct which caused his or her death.

> What the language plainly means is that the victim has knowingly and voluntarily *participated with the killer in some transaction that in and of itself would be likely to result in the victim's death, viewed from the perspective of a reasonable person.* An example would be two persons participating in a duel, with one being killed as a result. The statute does not encompass situations in which the killer surprises the victim with deadly force . . .

*Id.* (emphasis added).

Furthermore, the commentaries to the Model Penal Code make clear that the relevant inquiry under the "victim consent" mitigator is whether the victim consented to the criminal act which caused his or her death. The relevant commentaries explain that the "victim consent" mitigator obtains "chiefly in two kinds of situations." *See* Model Penal Code § 210.6(4)(c) commentaries at 140–41. First, where two individuals consent to participation in an activity highly dangerous to each, such as Russian roulette. Second, where the victim consents to a mercy killing. In both situations, the conduct to which the victim must consent, impliedly or expressly (*i.e.,* the shooting or the mercy killing) is the cause of the victim's death.

▮ Based on the foregoing, the Court finds that Section 848(m)(9) applies only if evidence shows that the victim gave express or implied consent to the conduct which caused his death. The Government's *Brady* obligations are to be executed pursuant to that determination.

### B. Application of § 848(m)(9) to This Case

Applying the principles set forth above, the Court finds that the defendants' *Brady* request with respect to Section 848(m)(9) is somewhat meritorious, but substantially overbroad. First, as discussed above, by

requesting all evidence indicating that the victims in this case were *engaged* in criminal activity at the time of their deaths, the defendants ignore (m)(9)'s limited focus on victim *consent*, as opposed to mere participation.

■ Second, the defendants' motion posits an overbroad construction of the relevant "criminal conduct" under (m)(9). The defendants assert that, pursuant to *Brady* and its progeny, Section 848(m)(9) affords them the due process right to pre-trial discovery of all evidence which indicates that the murder victims were engaged in *any criminal activity* at the time of their murders. However, as set forth above, (m)(9) strictly limits the relevant "criminal conduct" to that which caused the victim's death. Thus, it is simply irrelevant under (m)(9) that a victim consented to *some* criminal conduct at the time of his death, or that a victim was participating in drug trafficking activities at the time of his death, *unless that criminal conduct was the cause of his death.*

■ Furthermore, the defendants argue that, because the victims in this case were drug dealers, the defendants should not receive the death penalty. The Supreme Court of the United States, in *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), articulated the constitutional infirmities implicated by the defendants' argument:

> We are troubled by the implication that defendants whose victims were assets to their community are more deserving of punishment than those whose victims are perceived to be less worthy. Of course, our system of justice does not tolerate such distinctions.

*Id.* at 506 n. 8, 107 S.Ct. at 2534 n. 8 (*citing Furman v. Georgia,* 408 U.S. 238, 242, 92 S.Ct. 2726, 2728, 33 L.Ed.2d 346 (1972) (Douglas, J., concurring)); *see also Id.* at 506, 107 S.Ct. at 2534 ("Nor is there any justification for permitting [the imposition of a death sentence] on the perception that the victim was a sterling member of the community rather than someone of questionable character."). Although the Court, in *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), subsequently overruled its holding in Booth that victim impact statements were *per se* inadmissible in capi-

tal sentencing proceedings, *Payne* cannot be read to sanction a defense argument that a defendant is undeserving of the death penalty simply because his victim was a drug dealer. *See Payne,* 501 U.S. at 823, 111 S.Ct. at 2607 (recognizing the concern that "the admission of victim impact evidence permits a jury to find that defendants whose victims were assets to their community are more deserving of punishment than those whose victims are perceived to be less worthy," but stating that "[a] s a general matter, however, victim impact evidence is not offered to encourage comparative judgments of this kind . . .").

■ Moreover, a victim's participation in drug trafficking activities is not alone sufficient to constitute "consent" to the criminal conduct which caused his death under Section 848(m)(9), even where his murder is drug-related. It is true, of course, that participation is in some general way related to a drug transaction. Indeed, the "law has uniformly recognized that substantial dealers in narcotics possess firearms," *United States v. Kennedy,* 32 F.3d 876, 882–83 (4th Cir.1994), *cert. denied sub nom. Ingram v. United States,* 513 U.S. 1128, 115 S.Ct. 939, 130 L.Ed.2d 883 (1995), and that murder, assault, and other violent crimes are often associated with drug trafficking. *Id.; see also United States v. Lalor,* 996 F.2d 1578, 1584 (4th Cir.), *cert. denied,* 510 U.S. 983, 114 S.Ct. 485, 126 L.Ed.2d 436 (1993). Thus, it may be said that a participant in the drug trade to some extent "assumes the risk" of subjecting himself to deadly violence. That, however, is not consent to the criminal conduct that resulted in his death.

■ Section 848(m)(9) requires more than the mere "assumption of risk." *See Wuornos,* 676 So.2d at 975 (rejecting defendant's argument that the assumption of risk associated with seeking the services of a prostitute was sufficient to establish Florida's "victim consent" mitigator) The (m)(9) mitigating factor is only applicable where the victim actually or impliedly *consents* to the defendant's criminal conduct; it is not enough for the victim merely to have engaged in a generally dangerous activity. *See*

*Wuornos,* 676 So.2d at 975 ("It would be absurd to construe [the 'victim consent' mitigator] as applying whenever victims have engaged in some unlawful or even dangerous transaction that merely provided the killer a better opportunity to commit murder, which the victim did not intend.").[14] And, the victim must consent to the criminal conduct which caused his death; consenting generally to participation in the drug trade does not suffice under (m)(9).

▮ Indeed, the defendants' position is tantamount to the societal sanctioning of the death of every person who is engaged in the drug trade at the hands of those in that trade who are willing to resort to violence to forestall incursions into their market areas, to collect their accounts receivable, to redress grievances in their commerce or to effect retribution for real or unargued slights. To construe (m)(9) in that way would be absurd. And, of course, courts are to avoid statutory constructions which produce such results.

▮ Notwithstanding the overbreadth of the defense argument, the Court finds that the defendants are entitled to production of some *Brady* material with respect to Section 848(m)(9). In this case, the defendants allege that Sherman Ambrose, Dasmond Miller, Anthony Baylor, Marco Baylor and Anthony Merrit consented to the defendants' criminal activity which resulted in their deaths. The defendants, however, have proffered no "substantial basis for claiming," *Agurs,* 427 U.S. at 106, 96 S.Ct. at 2399, that (m)(9) applies to the Sugar Bottom murders of Anthony and Marco Baylor and Merrit. Based on the allegations of the Superseding Indictment and the limited record now before the Court, it appears that defendants Cazaco and Thomas ambushed the unsuspecting victims with deadly force. There is no evidence whatsoever of activities on the part of the victims that might establish the existence of implied consent to the defendants' conduct. Indeed, it can hardly be argued that Anthony Baylor consented to *any* criminal conduct on the part of Cazaco, Thomas, or any other

member of the Poison Clan, for Baylor expressly refused Devon Beckford's invitation to join the organization. At most, the victims of the Sugar Bottom murders consented generally to their participation in the drug trade, which is not sufficient to establish the applicability of Section 848(m)(9).

▮ A different situation is presented, however, with respect to the Ambrose and Miller murders. First, Ambrose and Miller were consensual participants in the Poison Clan, a known violent drug trafficking organization. And, as alleged in the Superseding Indictment, the leaders of the Poison Clan "routinely employ[ed] violence, including murder, *in order to maintain discipline and loyalty within the Poison Clan ...*" Superseding Indictment, Count Three, Manner and Means of the Conspiracy ¶ 24 (emphasis added). As participants in the activities of the organization, Ambrose and Miller presumably were aware of this leadership philosophy, the fruits of which resulted in their deaths, but nonetheless participated in the organization's criminal activities.

Moreover, based on Delroy Smith's account of the Ambrose and Miller murders, the events which transpired may indeed indicate implied consent by the victims to their fatal confrontation with Dean Beckford and Claude Dennis. For example, according to Smith, Dean Beckford and Miller were arguing over Miller's .35 Derringer immediately preceding the murders. And, Miller undoubtedly recognized that Dean Beckford was holding the gun at issue in his hands throughout the course of the argument. Notwithstanding that knowledge, and with awareness of Dean Beckford's history of violent crime (including murder), Miller engaged in a "scuffle" with Dean Beckford, took off his jacket, and formally challenged Dean Beckford to a fight. Furthermore, during the commission of the murders, Ambrose attacked Dennis and there was an exchange of gunfire between Dennis and Smith.

Based on the limited record before the Court, it is possible that the circumstances

---

**14.** The defendants assert that their victims' participation in drug trafficking activities involves the assumption of a significantly higher risk of death than does the solicitation of the prostitute in *Wuornos.* Whether or not this proposition is true, a victim's participation in the drug trade does not alone establish "consent" under Section 848(m)(9).

surrounding the Ambrose and Miller murders constituted the type of consensual dual envisioned by the *Wuornos* Court as to which the (m)(9) mitigating factor would obtain. *See Wuornos,* 676 So.2d at 975 ("An example would be two persons participating in a duel, with one being killed as a result."). On the other hand, depending upon the facts further adduced at trial, it may also be determined that these murders were, as the Government alleges, "situations in which the killer surprises the victim with deadly force," *Id.,* in which case (m)(9) would be inapplicable. At this pretrial stage of the prosecution, however, the Court need not determine whether the (m)(9) mitigator is applicable to the Ambrose and Miller murders. Indeed, the Court is ill-equipped to do so, considering that it is without the benefit of the full factual record, which, of course, will be adduced only at trial.

The Court finds, however, on the limited record before it, that the defendants at least advance a "substantial basis for claiming," *Agurs,* 427 U.S. at 106, 96 S.Ct. at 2399, that (m)(9) is applicable to the Ambrose and Miller murders, and that there is a "reasonable probability" that disclosure of favorable evidence pertinent to that mitigating factor would affect the result of the sentencing proceedings.[15] *See Kyles v. Whitley,* 514 U.S. at 431–37, 115 S.Ct. at 1565–67; *United States v. Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383–84; *United States v. Agurs,* 427 U.S. at 106, 96 S.Ct. at 2398–99. Therefore, under *Brady* and its progeny, the Government must produce any evidence in its possession which indicates that the victims of the fatal shootings at 1534 Tifton Court on December 4, 1988—Ambrose and Miller—"consented to the criminal conduct that resulted in the

victim's death" as that mitigating factor is construed in this Memorandum Opinion. Of course, the Government has the same obligation with respect to the Sugar Button murders as to information known to the Government that provides a pertinent account of those killings not known to the Court.

### III. Alternative Statutory and Non–Statutory Mitigating Factors

The defendants argue that, to the extent their motions for production pursuant to Sections 848(m)(8) and (9) are denied, they are entitled alternatively to the requested evidence under mitigating factor (m)(10) or under Section 848(j). Specifically, the defendants argue that, pursuant to *Brady* and its progeny, they are entitled to the entry of an order requiring the production of all evidence in the possession of the Government which documents all murders and/or other violent acts committed by their co-defendants and co-conspirators, whether charged or uncharged, in furtherance of the Poison Clan CCE or drug conspiracy. The defendants assert that this material constitutes mitigating evidence under (m)(10) and Section 848(j), and that the Eighth Amendment requires that the jury be able to consider and give effect to all relevant mitigating evidence. Those arguments need not long detain us.

### A. Mitigating Factor § 848(m)(10)

Under 21 U.S.C. § 848(m), in determining whether a sentence of death is to be imposed on a defendant, the finder of fact shall consider as mitigating evidence, in addition to the specific mitigating factors set forth in subsections (1)-(9),

---

15. In a case presenting substantially similar facts as those surrounding the Ambrose and Miller murders, the jury found, upon the district court's submission of the (m)(9) mitigating factor, that the victims consented to the criminal conduct that resulted in their deaths. *See United States v. Flores,* 63 F.3d at 1367. In *Flores,* the kingpin of a CCE, Garza, was convicted of three counts of murder in furtherance of the CCE and a drug conspiracy punishable under 21 U.S.C. § 841(b)(1)(A), in violation of Section 848(e)(1)(A). The three murder victims were associates of Garza's and co-conspirators in his drug trafficking organization; Garza had ordered defendant Flores to murder the victims because of his suspicions that the victims were cooperating with the police to the detriment of the CCE. At the sentencing phase, Garza apparently argued that the victims consented to the acts that resulted in their death, and the district court instructed the jury to consider mitigating factor (m)(9). Although the jury agreed with Garza, finding that the (m)(9) mitigator was established, it recommended, and the district court imposed, a sentence of death for Garza. The Fifth Circuit, upon review of Garza's conviction and sentence, noted the jury's (m)(9) finding, but did not address it substantively.

That other factors in the defendant's background or character mitigate against imposition of the death sentence.

21 U.S.C. § 848(m)(10).

 The defendants are correct, of course, that the Eighth Amendment requires that the jury be able to consider and give effect to all relevant mitigating evidence. *See Boyde v. California*, 494 U.S. 370, 377, 378, 110 S.Ct. 1190, 1196, 108 L.Ed.2d 316 (1990); *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989); *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). And, to some extent, mitigating factor (m)(10) is a "catch-all" factor which partially effectuates this constitutionally required open-door policy toward mitigation evidence. However, the defendants' attempt to procure evidence of co-conspirator conduct pursuant to (m)(10) is misguided.

The plain language of (m)(10) forecloses the defendants' argument. That section provides that the jury may consider any "factors in the *defendant's background or character*" which "mitigate[s] against imposition of the death sentence." 21 U.S.C. § 848(m)(10) (emphasis added). Clearly, the violent conduct of a defendant's *co-conspirators* is not a "factor in the *defendant's* background or character." *Id.* (emphasis added). Therefore, the evidence requested by the defense is irrelevant with respect to the mitigating factor set forth in (m)(10), and no *Brady* production is required on that basis.

**B. Section 848(j)**

The defendants' argument under Section 848(j) is more persuasive, however. Subsection (j), entitled "Proof of aggravating and mitigating factors," provides in part: "In the sentencing hearing, information may be presented as to matters relating to any of the ... mitigating factors set forth in subsection[ ] (m) of this section, or *any other mitigating factor* ..." 21 U.S.C. § 848(j) (emphasis added). That provision further states that:

> [a]ny other information relevant to such mitigating ... factors may be presented by ... the defendant, regardless of its

admissibility under the rules governing admission of evidence at criminal trials, except that information may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.

*Id.* (emphasis added). The defendants argue that evidence of their co-conspirators' violent acts is "relevant to," if not directly within the scope of, mitigating factor (m)(8), in that certain co-conspirators, who are not charged with a capital crime under § 848(e)(1)(A), and who thus will not be punished by death, are equally culpable in the CCE and are as deserving of the death penalty as the capital defendants in this case. In effect, then, the defendants propose to offer this "disparate treatment" evidence as a non-statutory mitigating factor at sentencing, and they therefore seek discovery of any evidence in the Government's possession material to that factor.

With respect to their *Brady* request as it is animated by Section 848(j), the defendants' arguments are somewhat divergent. At oral argument on this matter, Defendant Beckford limited his Section 848(j) *Brady* request to the production of: (1) all evidence in the possession of the Government concerning murders committed by all co-conspirators, charged or uncharged, in furtherance of the CCE or conspiracy; and (2) all other acts of violence committed by any co-conspirator who has committed such a murder. Defendant Thomas, however, argues that he is entitled to *all* acts of violence committed by all co-conspirators, charged or uncharged, irrespective of whether the act of violence resulted in the death of the victim or whether the act was committed in furtherance of the Poison Clan's illegal activities. Defendants Dennis and Cazaco did not specify the scope of their Section 848(j) requests.

 The Government concedes, as well it should, that the defense advances a "substantial basis for claiming" that Section 848(j) would permit the defendants to admit, at the sentencing phase, mitigation evidence relating to the commission, in furtherance of the Poison Clan CCE or drug conspiracy, of any

murder or other death-eligible offense by any co-conspirator or co-defendant, charged or uncharged, against whom the Government does not seek the death penalty. Armed with that evidence, the defendants may argue in mitigation that other individuals, who killed in furtherance of Poison Clan activities and were thus equally culpable with respect to the overall CCE, were not charged with a capital offense by the Government, and thus will not be punished by death. For example, a death-eligible defendant charged with murder under Section 848(e)(1) who assisted in the killing of one victim would be able to argue in mitigation of the death penalty that a co-defendant or co-conspirator who killed five victims would not be punished by death. There is, at least "a substantial basis for claiming" that evidence of that ilk is "relevant to" the (m)(8) mitigating factor within the meaning of Section 848(j). Therefore, the Government shall produce all evidence in its possession relating to the commission, in furtherance of the Poison Clan CCE or drug conspiracy, of any murder or other death-eligible offense by any co-conspirator or co-defendant, charged or uncharged, who will not be punished by death.

Beyond that evidence, however, the defense requests are overbroad and are therefore denied. It is important to note that, as evidenced by the defendants' request here, Section 848(j) presents the prospect of an "evidentiary free-for-all" at the sentencing hearing. *See United States v. Spivey*, 958 F.Supp. 1523, 1529 (D.N.M.1997); *United States v. Bradley*, 880 F.Supp. 271, 289 (M.D.Pa.1994); *United States v. Pretlow*, 779 F.Supp. 758, 770 (D.N.J.1991). Congress had no such scenario in mind in enacting this provision. And, even if Congress envisioned such a result, the courts should never permit it. Although subsection (j) provides wide latitude with respect to the admission of relevant mitigating evidence, as is required by the Constitution, it also limits the scope of such information by imposing upon the district court the important obligation of excluding information for which the "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury." 21 U.S.C. § 848(j). *See United States v. Spivey*, 958 F.Supp. at

1529; *United States v. Bradley*, 880 F.Supp. at 290–91; *United States v. Pretlow*, 779 F.Supp. at 771.

 Most of the evidence requested by the defense would be inadmissible at sentencing under subsection (j)'s limited exclusionary rule. First, Defendant Beckford seeks all evidence of *other violent acts*, whether or not committed in furtherance of Poison Clan activities, committed by co-defendants and co-conspirators who have murdered in furtherance of the CCE and against whom the Government does not seek the death penalty. The defendants claim that, because the Government has indicated, in its Notice of Intent To Seek A Sentence of Death, that it intends to rely on the defendants' prior acts of violence in establishing the non-statutory aggravating factor of "future dangerousness," the prior acts of violence of non-capital co-defendants and uncharged co-conspirators are relevant mitigation evidence. The defendants, theory appears to be that the stronger the Government's hypothetical aggravation case would be against a co-defendant or co-conspirator who committed a capital crime for which he will not be punished by death, the greater is the injustice in sentencing the capital defendants to death in this case.

Permitting the defendants to submit evidence of that sort and the ensuing argument on that point undoubtedly would lead to "confusion of the issues, or misleading the jury." 21 U.S.C. § 848(j). In effect, the defendants propose to conduct a series of separate mini-trials consisting of aggravation cases against each of their co-conspirators against whom the Government could have, but did not, seek a penalty of death. The Government then would be entitled to rebut that point by proffering "mitigation evidence" on behalf of those co-conspirators who murdered but do not face capital charges. *See Id.* ("The Government ... shall be permitted to rebut any information received at the [sentencing] hearing and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any ... mitigating factors ..."). Evidence concerning the violent background of co-conspirators

would be entirely collateral to the issues properly before the jury at the sentencing phase—whether the culpability of the capital defendants rises to a level deserving of capital punishment. As a matter of law, any probative value of such evidence would be substantially outweighed by the dangers of confusion of the issues or misleading the jury, which would inure to the prejudice of both the defense and the Government.

Thomas posits an even broader construction of Section 848(j) than does Beckford. Thomas seeks, under *Brady*, production of all violent acts committed by members of the Poison Clan, without regard to whether an act constituted a capital offense or to whether the act was in furtherance of the CCE. Thomas asserts that this evidence is "relevant to" the relative culpability determination under mitigating factor (m)(8). Thomas, however, puts more weight on subsection (m)(8) and on Section 848(j) than they can support. Permitting the introduction at sentencing of evidence pertaining to *any* act of violence by a co-defendant or co-conspirator certainly would lead to the confusion of issues and misleading of the jury. Any probative value of such information is substantially outweighed by these dangers. Indeed, the approach urged by Thomas would result in precisely the "evidentiary free-for-all" Congress sought to avoid with the limiting language in Section 848(j). *See United States v. Spivey*, 958 F.Supp. at 1529; *United States v. Bradley*, 880 F.Supp. at 289; *United States v. Pretlow*, 779 F.Supp. at 770.

Therefore, the Government's Brady obligation to produce material pursuant to Section 848(j) shall be limited to that evidence which relates to the commission, in furtherance of the Poison Clan CCE or drug conspiracy, of any murder or other death-eligible offense by a co-conspirator or co-defendant, charged or uncharged, against whom the Government does not seek the death penalty.

For the reasons set forth in this Memorandum Opinion, the defendant's motions for production of *Brady* material pursuant to 21 U.S.C. § 848(j), (m)(8), (m)(9), and (m)(10) are GRANTED IN PART. The Govern-

ment's production of *Brady* material pursuant to this Memorandum Opinion and the accompanying Order shall comply with the dictates of this Court's previous Memorandum Opinion and Order dated April 4, 1997, which governs all pre-trial disclosure by the Government of *Brady* and *Jencks* material.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.