OPINION OF THE COURT
Marcy L. Kahn, J.
Defendant Corey Arthur is charged with murder in the first degree (Penal Law § 125.27 [1] [a] [vii]) and other crimes.[1] He has moved for an order declaring that a heightened standard of care and scrutiny be applied to all phases of this case and for an order compelling discovery of various items. The People oppose both motions, except to the extent that they have already provided discovery or are in the process of doing so. The People have also cross-moved for statutory reciprocal discovery and for a protective order delaying disclosure of certain portions of the applications underlying search warrants issued in this case.[2]
I. FACTUAL BACKGROUND
Defendant and his codefendant, Montoun Hart, are each charged with murder in the second degree (Penal Law § 125.25 *745 [3]) and two counts of robbery in the first degree (Penal Law § 160.15 [2], [3]). Defendant Arthur is also charged with an additional count of murder in the second degree (Penal Law § 125.25 [1]) and, as noted, murder in the first degree. The People contend that on May 30, 1997, defendants caused the death of Jonathan Levin while engaged in the attempted commission and commission of the crime of robbery. Specifically, they allege that defendants tied up Jonathan Levin in his apartment at 205 Columbus Avenue with tape, cut and stabbed him with a sharp instrument, and forcibly seized from him a Chase Manhattan Bank ATM card and PIN number. According to the People, defendant Arthur killed Jonathan Levin by shooting him in the head with a pistol. The People allege that the ATM card was subsequently used to withdraw funds from Jonathan Levin’s account at Chase Manhattan Bank, which moneys defendants divided between them.
II. PROCEDURAL HISTORY
Defendant was arrested on June 7, 1997 and arraigned on the indictment on July 7, 1997. As conceded by the defense, the People have accorded defendant extensive discovery in this case, commencing even prior to defendant’s arraignment on the indictment, and in many respects exceeding statutory requirements, including some information bearing on mitigation.[3]
Specifically, in response to a defense request, the People vouchered numerous items recovered as a result of the execution of a warrant to search the crime scene (the apartment of Jonathan Levin), and subsequently afforded the defense access to the apartment. On June 26, 1997, the People furnished the defense with a copy of the voluntary disclosure form (VDF) pertaining to codefendant Hart, which provided CPL 710.30 notice of the contents of alleged statements made by Hart and identification procedures pertaining to Hart, a list of numerous items allegedly obtained from defendants and from the crime scene, and information concerning identification and fingerprint evidence. Discovery of defendant’s own statements to the police was afforded on June 27, in advance of his arraignment on the indictment. Additionally, on July 3, 1997, still prior to arraignment, the People furnished defendant with the VDF in his case *746 which contained notices pursuant to CPL 710.30, as well as notice of additional items obtained from defendants and from the crime scene. At defendant’s July 7 arraignment, the People provided defendant with numerous forensic reports. On July 18, the People served additional statement notice pertaining to each defendant.
On July 22, 1997, the People responded to defendant’s June 20 discovery demand, providing numerous police reports, additional forensic reports, a list of additional property omitted from the VDFs, a list of the names, addresses and birth dates of witnesses claiming to have seen Jonathan Levin the day after the alleged murder, and a list of numerous police personnel participating in the investigation. They also provided the defense with opportunities to inspect evidence they had obtained from Chase Manhattan and NYNEX, as well as numerous items concerning, inter alia, Jonathan Levin, the high school at which he had taught defendant, defendant’s own high school records, and the high school records of four other students.
The People subsequently turned over to the defense all documents which they intend to introduce at trial. Included among these materials were all documents recovered from the crime scene which mention either of the defendants or are otherwise linked to either defendant, as well as all documents referencing Jonathan Levin’s alleged purchase, acquisition or use of controlled substances. They have also made available to defendant any item recovered from any premises or automobile occupied by either defendant which mentions Jonathan Levin or is otherwise linked to him. The People have also provided 911 tapes and other audiotapes and videotapes to defendant.
What is at issue on this motion is defendant’s entitlement to various other items. The People have refused to disclose prior to trial the names, addresses, and dates of birth of their witnesses,[4] any statements they have made, any impeaching evidence as to those witnesses, police reports, statements made by defendant to individuals other than law enforcement personnel, items of a personal nature belonging to Jonathan Levin which they claim are irrelevant to the case, and any additional *747 evidence of a mitigating nature, which they claim would pertain only to a capital sentencing proceeding, contending that defendant has failed to establish entitlement to these materials under CPL 240.20 and 240.40, or any other provision of law.[5]
[6] In response to defendant’s contention that certain of these items constitute Brady material which must be disclosed prior to trial, they assert that Brady material need not be disclosed prior to trial and that evidence of a mitigating nature does not constitute Brady material.
Much of the People’s opposition to defendant’s demands relates solely to the timing of, and not defendant’s entitlement to, discovery. They argue that a heightened due process standard applies only at the sentencing proceeding of a capital case and not at the pretrial or trial stages. They also maintain that in most instances disclosure shortly before trial would be adequate, even as to potential Brady material, and with respect to evidence relating to mitigation, they contend that it need not be turned over until after conviction and prior to the sentencing proceeding, citing CPL 400.27 (14). They further argue that impeachment material constitutes Rosario, rather than Brady, material and is, therefore, subject to disclosure pursuant to CPL 240.45, and that the rule set forth in Giglio v United States (405 US 150 [1972]) entitles defendant to disclosure, as opposed to discovery.
III. MOTION FOR ORDER FOR DECLARATION OF HEIGHTENED
STANDARD OF CARE AND REVIEW
The parties agree that a heightened standard of due process pertains in capital cases. Defendant asserts that this standard should be applied at all stages of a capital case, based upon legislative intent, State constitutional law, decisions rendered under the predecessor statute, and Federal constitutional law. The People, on the other hand, argue that a heightened standard of due process applies only at a capital sentencing proceeding and not at the pretrial or trial stages, citing California v Ramos (463 US 992, 998-999 [1983]), and other cases. They also note that numerous courts of coordinate jurisdiction in this State have rejected the application of heightened due process in a capital case prior to the sentencing proceeding.
*748 Defendant’s initial arguments merit only brief discussion while the Legislature, in reinstating the death penalty, enacted special protections for capital defendants, e.g., specially trained and appointed counsel (Judiciary Law § 35-b), additional time for pretrial motions (CPL 250.40 [3]), individual voir dire of prospective jurors (CPL 270.16), and direct appeals as of right to the Court of Appeals (CPL 450.80 [3]), there is no specific legislative provision requiring a trial court to apply heightened scrutiny or more exacting substantive standards to every aspect of a capital case. The Legislature’s express amendment of certain provisions of existing law, taken together with its failure to modify other provisions creates an inference of a legislative intent to leave such existing provisions intact. (McKinney’s Cons Laws of NY, Book 1, Statutes § 240; see, People v Heard, NYLJ, May 17, 1996, at 26, col 6 [Sup Ct, NY County 1996].)
To the extent that defendant seeks an interpretation of the New York Constitution as requiring an expansion of defendant’s due process rights during the guilt phase, this court is without authority to make such a determination. A trial court is constrained not to announce new, noninterpretative, policy-driven constructions of the State Constitution, for to do so would impinge upon “the policy and rule-making function traditionally perceived as the exclusive domain of the Court of Appeals”. (People v Keta, 165 AD2d 172, 177 [2d Dept 1991], revd on other grounds 79 NY2d 474 [1992]; see also, Hope v Perales, 150 Misc 2d 985, 1000 [Sup Ct, NY County 1991] [Ciparick, J.], affd on other grounds 189 AD2d 287 [1st Dept 1993], revd on other grounds 83 NY2d 563 [1994].)
Furthermore, the Court of Appeals decisions upon which defendant relies which reversed death sentences due to procedural errors under New York’s prior capital punishment statute are not apposite. These decisions impose no stricter standards on trial courts in capital cases. (See, e.g., People v Jackson, 14 NY2d 5 [1964]; People v Rensing, 14 NY2d 210 [1964]; People v Rosario, 9 NY2d 286 [1961]; People v Miller, 6 NY2d 152 [1959]; People v Leyra, 302 NY 353 [1951].) In addition, these decisions antedated the Supreme Court’s announcement in Woodson v North Carolina (428 US 280 [1976]), that a heightened standard of care was required by US Constitution Eighth Amendment in capital cases. Finally, many of the concerns raised in these decisions have been addressed directly through statutory enactments, such as provisions expressly setting forth the standards to be applied on appellate review (CPL 470.30 [1]).
*749 Defendant’s argument concerning the implications of the Federal Constitution, however, requires closer attention. Because I believe both sides here have misapprehended the teachings of the Supreme Court as to the higher standard to be applied in capital cases, I find it necessary to examine those decisions in some detail.
In Woodson v North Carolina, the Supreme Court acknowledged that: “the penalty of death is qualitatively different from a sentence of imprisonment, however long * * * Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.” (428 US 280, 305, supra.)
The recognition that “death is different” has been echoed in subsequent cases, each premised on the Court’s stated concern that while the discretion of a capital sentencing jury must be channeled (see, Furman v Georgia, 408 US 238 [1972]), it is also of critical importance that a capital sentencing determination be made on an individualized basis (see, Lockett v Ohio, 438 US 586 [1978]; Woodson v North Carolina, supra). The goal to be served is “the fundamental respect for humanity underlying the Eighth Amendment” (Woodson v North Carolina, supra, at 304).
Although the Court has refrained from developing any systematic approach or substantive rubric for applying a higher standard in capital cases, it has, on a case-by-case basis, insisted that unique safeguards be employed to insure that death is the appropriate sentence in a given case. (See, e.g., Turner v Murray, 476 US 28 [1986] [voir dire on racial bias of sentencing jury required in interracial murder cases]; Beck v Alabama, 447 US 625 [1980] [instruction on lesser included offense required in cases where evidence would support conviction for noncapital crime]; Gardner v Florida, 430 US 349 [1977] [prohibiting imposition of death sentence based on presentence report which defendant had no opportunity to review]; see generally, Steiker and Steiker, Sober Second Thoughts: Reflections on Two Decades of Constitutional Regulation of Capital Punishment, 109 Harv L Rev 355, 398-401 [1995].)
It is clear that these decisions applying a higher standard of review in capital cases emanate from the Eighth Amendment’s *750 Cruel and Unusual Punishment Clause.[6] As explained in California v Ramos (463 US 992, 998-999, supra), in these cases “[t]he Court * * * has recognized that the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination.” It is upon this language, as well as upon the Eighth Amendment origins of the Court’s “death is different” doctrine, that the People here rely in urging that application of heightened scrutiny pertains only during the sentencing phase of a capital proceeding. While many courts of coordinate jurisdiction have rejected the notion that heightened due process standards apply to all aspects of a capital case, most of these courts have merely declined to apply the standard at the particular stage of the proceedings urged, without stating expressly that a higher standard had no application outside of the sentencing proceeding itself.[7]
*751 In my view, while not applying heightened due process to all aspects of a capital case, the Supreme Court’s decisions neither expressly nor implicitly limit invocation of a higher standard to the sentencing proceeding. At the outset, the Supreme Court has never mandated that any specific procedures be employed in State capital prosecutions and, while approving bifurcated proceedings (see, Gregg v Georgia, 428 US 153, 195 [1976]), the Court has never expressly required that a separate sentencing proceeding be held in order to assure compliance with constitutional standards. (See, McGautha v California, 402 US 183 [1971].)
Instead, the Court’s concern has been to insure the reliability of the death sentence determination, regardless of the specific mode of proceedings employed in a particular State.[8] To this end, the Court has required that a heightened standard of reliability must be utilized in terms of fact-finding in the context of a capital case. For example, in Ford v Wainwright (477 US 399 [1986]), a decision subsequent to California v Ramos (supra), the Court applied a heightened standard of due process in a habeas corpus proceeding to invalidate a State’s post-conviction procedures for determining the sanity of a death row prisoner. The Court stated:
*752 “In capital proceedings generally, this Court has demanded that factfinding procedures aspire to a heightened standard of reliability. See, e.g., Spaziano v. Florida, 468 U. S. 447, 456 (1984). This especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different. See Woodson v. North Carolina, 428 U. S. 280, 305 (1976) (opinion of Stewart, Powell, and Stevens, JJ.). .
“Although the condemned prisoner does not enjoy the same presumptions accorded a defendant who has yet to be convicted or sentenced, he has not lost the protection of the Constitution altogether; if the Constitution renders the fact or timing of his execution contingent upon establishment of a further fact, then that fact must be determined with the high regard for truth that befits a decision affecting the life or death of a human being. Thus, the ascertainment of a prisoner’s sanity as a predicate to lawful execution calls for no less stringent standards than those demanded in any other aspect of a capital proceeding.” (Supra, at 411-412.)
In Ford (supra), the Court applied a heightened standard of due process to proceedings occurring after the conclusion of the sentencing phase, because the central concern where the death penalty may be imposed is that all of the fact-finding relating to the determination of the death sentence be held to the highest standards of reliability in order to ensure a basis for confidence in the sentence. “[Consistent with the heightened concern for fairness and accuracy that has characterized our review of the process requisite to the taking of a human life” (supra, at 414), the Court stated, “the factfinder must ‘have before it all possible relevant information about the individual defendant whose fate it must determine.’ ” (Ford v Wainwright, supra, at 413, quoting Jurek v Texas, 428 US 262, 276 [1976] [plurality opn].) The Court’s express statements in Ford, as well as its focus on applying, even in a postconviction habeas review, “no less stringent standards than those demanded in any other aspect of a capital proceeding” (supra, at 411-412) to a fact-finding hearing relating to the sentencing determination, suggests that a heightened due process standard applies not at a particular time in a capital prosecution, but rather to a particular function, i.e., the making of factual determinations relating to sentencing.
Further support for this conclusion is found in Beck v Alabama (447 US 625, supra). There, the Court held that a guilt phase jury in a capital case may not be prohibited from *753 considering a lesser included noncapital offense, when a reasonable view of the evidence would have supported such conviction. The Court acknowledged that it had never held that lesser included offenses had to be charged in noncapital cases as a matter of due process, but opined that the risks inherent in failing to require such a charge in a capital case were constitutionally intolerable under the Eighth Amendment. (Supra, at 637, citing Gardner v Florida, 430 US 349, 357-358, supra [Stevens, J.] [“(D)eath is a different kind of punishment from any other which may be imposed in this country”].) The Court held that in cases in which the evidence leaves some doubt as to an element of the capital offense, the failure to give the trial jury the third option of finding the defendant guilty of a lesser included offense would enhance the risk of an unwarranted conviction, a circumstance which cannot be countenanced in a capital case. (Beck v Alabama, supra, at 637-638.) The Court explained: “To insure that the death penalty is indeed imposed on the basis of ‘reason rather than caprice or emotion,’ we have invalidated procedural rules that tended to diminish the reliability of the sentencing determination. The same reasoning must apply to rules that diminish the reliability of the guilt determination.” (Supra, at 638.) Without the third option of the lesser included noncapital offense, the jury could face a Hobson’s choice of either convicting of a capital offense as to which guilt had not been proven or acquitting merely to avoid the punishment of death. Finding that the Alabama statute at issue impermissibly forced the jury to decide on guilt of a capital crime without having any standards to guide its judgment, the Court held that providing the option of the lesser included noncapital offense was necessary to eliminate such extraneous factors from influencing the jury’s decision-making process.
Similarly, in Turner v Murray (476 US 28, supra) the Court found that the failure to voir dire jurors as to racial bias could have resulted in the imposition of a sentence of death through whim or caprice. There, the Court found a violation of the defendant’s Sixth Amendment right to an impartial jury and vacated the sentence. The Court did not reverse the judgment of conviction, however, as in that case, the jury had no greater discretion to find the defendant guilty of the capital crime than it would have of a noncapital crime, and because of the greater degree of subjectivity it found inhering in the jury’s sentencing determination as contrasted with its guilt or innocence finding. (Supra, at 38, n 12, but see, concurring opn of Brennan, J. *754 [finding that conviction should have been overturned as well].) Although in Turner the Supreme Court relied upon the defendant’s Sixth Amendment rights without specifically invoking its Eighth Amendment jurisprudence, the decision established a higher degree of scrutiny for the selection of a jury which would make a capital sentencing determination.
The connecting thread running through the Supreme Court’s decisions applying heightened scrutiny in capital cases is that the Eighth Amendment requires that a higher level of scrutiny be applied at any stage of a capital case that directly affects the sentencing determination: a heightened standard of reliability is required in determining that death is the appropriate punishment, whenever that determination is being made. This may require the establishment of additional safeguards at various times during a capital proceeding, e.g., during postconviction proceedings, despite the diminution in rights afforded to convicted individuals (Ford v Wainwright, supra), during the guilt phase, in charging the jury (Beck v Alabama, supra), or even prior to commencement of the trial, during jury selection (Turner v Murray, supra), to the same extent as is necessary during the sentencing proceeding itself (Gardner v Florida, supra). What is crucial is that a heightened standard of reliability be employed whenever the fact-finding process as to the appropriateness of the death penalty is affected.
Under New York’s capital punishment scheme, the trial, or guilt phase, of a capital proceeding is uniquely interwoven with the sentencing proceeding. With two exceptions not at issue here,[9] the aggravating factor(s) which a New York capital sentencing jury will weigh against mitigating factors to determine the appropriate sentence are established during the trial, and may not be relitigated during the sentencing proceeding. (CPL 400.27 [3].) This is the case even if alternate jurors are substituted (CPL 400.27 [2]) or if a new jury is empaneled at the commencement of the sentencing proceeding (CPL 400.27 [6]).
In Lowenfield v Phelps (484 US 231 [1988]), the Supreme Court upheld a Louisiana statute which permitted a sentencing jury to rely on an aggravating factor which had already *755 been established at trial, based on the premise that the narrowing constitutionally required by Furman (408 US 238, supra) may occur during the guilt phase of the proceeding. Under the New York statute, as was true with the Louisiana statute in Lowenfield,[10] the determination that the murder at issue is one of the few that State policy makes eligible for a sentence of death is made during the guilt phase, not during the penalty phase. Put otherwise, a portion of the sentencing determination in a capital case under our statute always takes place during the trial, and prior to the commencement of the sentencing proceeding.
Thus, in my view, the Supreme Court’s decisions applying heightened scrutiny, as well as the inherent structure of New York’s unique capital punishment legislation, support defendant’s position to the extent that he urges that the higher procedural standards designed to assure greater reliability of a capital sentencing decision are not cabined strictly within the capital sentencing proceeding authorized by CPL 400.27. Any aspect of a capital case which directly affects the reliability of the fact-finding process regarding sentencing should be subject to heightened scrutiny. While certain stages of capital litigation would rarely, if ever, present such a circumstance (e.g., Grand Jury proceedings or arraignment), the same cannot be said of the discovery process. For example, the inability of the defense in a capital case to have access prior to trial to information bearing directly on either aggravating or mitigating factors, whether or not such information was exculpatory,* [11] and to pursue its own investigation of such information in advance of trial, could prevent the jury from considering evidence which could be dispositive of its sentencing determination in a given case, or, at the very least, from “hav[ing] before it all possible relevant information about the individual whose fate it must determine.” (Jurek v Texas, 428 US 262, 276, supra.)
Nonetheless, neither the extensive briefing and arguments of counsel nor this court’s own exhaustive research has unearthed any precedent from any other jurisdiction for the issuance of *756 the type of declaratory judgment presently sought by defendant that a higher standard of care and review be applied to all aspects of a capital case, and in this court’s view, issuance of such an order would be inappropriate. Accordingly, his motion seeking such an order is denied. It is appropriate, however, for the court to consider the need for heightened standards whenever it is addressing any aspect of the case which directly affects the reliability of the fact-finding process regarding sentencing. To the extent that defendant’s Eighth Amendment rights are implicated in his motion to compel discovery under CPL article 240, they will be addressed in section IV of this opinion.
. All parties have been repeatedly advised by this court, and are reminded, that this court views this case and the awesome issues it presents with the utmost seriousness, and will do all within its power and authority to ensure that all available safeguards are employed to protect the defendant’s constitutional and statutory rights at all stages of the case.
IV. MOTION TO COMPEL DISCOVERY
A. Legal Standards
1. CPL 240.20
In a criminal case, defendant may obtain discovery as of right only of items which are statutorily authorized. (People v Colavito, 87 NY2d 423 [1996]; People v Copicotto, 50 NY2d 222 [1980].) The legislative scheme established under article 240 codifies the rules of discovery dictated by constitutional command (CPL 240.20 [1] [h]), as well as those required by common-law notions of fundamental fairness (CPL 240.20, 240.43, 240.44, 240.45), together with those mandated by legislative policy (CPL 240.20, 240.30). (Preiser, Practice Commentaries, McKinney’s Cons Laws of NY, Book 11 A, CPL 240.10, at 216.) The capital murder legislation did hot modify the existing discovery provisions of article 240.
CPL 240.20 (1) requires the People to disclose the items enumerated to the defendant “upon a demand”, meaning at the time they are sought. (People v DaGata, 86 NY2d 40, 44 [1995].) This obligation flows from the underlying legislative policy goals in all criminal cases of enabling the defendant to make a better informed plea decision, minimizing the tactical advantages held by the prosecution and, to some degree, increasing the chances that the jury’s determination of guilt or innocence *757 will be an accurate one. (People v Copicotto, supra, at 226.) The court must order discovery as to any material not disclosed on demand pursuant to CPL 240.20 if it finds that the prosecutor’s refusal to disclose such material is not justified. (CPL 240.40 [1] [a].)
There is no general constitutional right to discovery in criminal cases, however. (Weatherford v Bursey, 429 US 545, 559 [1977]; Matter of Miller v Schwartz, 72 NY2d 869 [1988].) Even in capital cases, discovery has been limited to that which is statutorily mandated. (See, Matter of Pirro v LaCava, 230 AD2d 909 [2d Dept 1996], lv denied 89 NY2d 813 [1997]; Matter of Kaplan v Tomei, 224 AD2d 530 [2d Dept 1996].)
In this case, both sides agree that the People must comply with the strictures of CPL 240.20. Disagreement arises, however, on the application of CPL 240.20 (1) (h), which states:
“[ejxcept to the extent protected by court order, upon a demand * * * the prosecutor shall disclose to the defendant * * *
“[a]nything required to be disclosed, prior to trial, to the defendant by the prosecutor, pursuant to the constitution of this state or of the United States.”
Defendant’s claims of entitlement under CPL 240.20 (1) (h) must be examined in light of the Federal constitutional commands of heightened scrutiny under the US Constitution Eighth Amendment’s Cruel and Unusual Punishment Clause (super due process), under the US Constitution Fifth Amendment’s Due Process Clause (Brady material), and in light of the US Constitution Sixth Amendment’s guarantee of effective assistance of counsel.
2. Eighth Amendment
As discussed above, the Eighth Amendment requires that a heightened standard of care be applied to fact-finding respecting a capital sentencing determination. Should discovery directly impact these concerns, defendant’s constitutional right to discovery incorporated in CPL 240.20 (1) (h) would be implicated. Specifically, where defendant demonstrates that the material he seeks to discover bears on fact-finding relating to the capital sentencing determination itself, e.g., where it directly relates to mitigating or aggravating factors, and could affect the reliability of that determination, it would appear that the Eighth Amendment’s heightened due process standards may be applicable and would require that disclosure be made, even at this pretrial stage. To the extent that defendant *758 makes such a showing, the material must be produced in accordance with the provisions of CPL 240.20 (1) (h) and the Eighth Amendment. The People should be guided in their disclosure by the same standard.
3. Brady Issues
In Kyles v Whitley (514 US 419, supra), the Supreme Court reversed both a habeas corpus petitioner’s conviction and his death sentence due to a prosecutor’s inadequate Brady disclosure, stating that the Court’s “ ‘duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case’ [citations omitted]” (514 US 419, 422). In Kyles, the Court relied upon notions of fundamental fairness inhering in the Due Process Clause, without specifically mentioning its Eighth Amendment jurisprudence. These tenets require that the prosecutor furnish to the defendant all material in the People’s possession, and within the possession of those with whom it is working on the case (supra), which is both “favorable to the [defense and] material either to guilt or to punishment.” (Brady v Maryland, 373 US 83, 87, supra; People v Wright, 86 NY2d 591 [1995].) CPL 240.20 (1) (h) makes Brady material subject to the provisions of New York’s statutory discovery rules as well. Here, the parties disagree as to the definition of Brady material, the scope of the prosecutor’s disclosure obligation, and the time at which disclosure must be made.
a. Brady Material Defined
To be favorable to the defendant, evidence need not be determinative of guilt or innocence, but must “tend to exculpate” the defendant. (Brady v Maryland, supra, at 88.) With respect to the materiality requirement, the Court of Appeals has explained in People v Vilardi (76 NY2d 67 [1990]) that the standard applicable as a matter of State constitutional law where a specific request for material has been made is that evidence is considered material if there exists a reasonable possibility that the failure to disclose it might have affected the outcome of the trial. (Supra, at 73-77, adopting United States v Agurs, 427 US 97, 108 [1976].) With respect to Brady material not specifically requested, the “reasonable probability” of a different outcome remains the standard under People v Chin (67 NY2d 22, 33 [1986]). However, the “mere possibility that an item of undisclosed [evidence] might have helped the defense * * * does not establish ‘materiality’ in the constitutional *759 sense.” (United States v Agurs, supra, at 109-110.) Although these cases treated Brady issues retrospectively, whereas the issue is presented here prior to trial, the same standard applies. (Supra.)
The People dispute the inclusion of impeachment material and mitigating evidence within the definition of exculpatory evidence.
i. Impeachment evidence
Where a witness’ reliability may be dispositive of guilt or innocence, material evidence affecting that witness’s credibility constitutes exculpatory evidence. (Giglio v United States, 405 US 150, 154, supra.) Information bearing on a witness’ ability to perceive or recall the events in issue, her bias, hostility or motive to fabricate, or any information which, if known to the trier of fact, could possibly affect the outcome of the trial constitutes material evidence affecting the witness’ credibility. (People v Gissendanner, 48 NY2d 543, 548 [1979]; People v Cesar G., 154 Misc 2d 17, 23-24 [Crim Ct, NY County 1991]; see, Giglio v United States, supra [nondisclosure of Government’s cooperation agreement with witness]; People v Baxley, 84 NY2d 208 [1994] [recantation by key prosecution witness]; People v Novoa, 70 NY2d 490 [1987] [promise of leniency to government witness]; People v Cwikla, 46 NY2d 434 [1979] [cooperation agreement]; People v Reusing, 14 NY2d 210, supra [witness’ psychiatric history]; People v Savvides, 1 NY2d 554 [1956] [correction of inaccurate testimony by government witness]; People v Shulman, 172 Misc 2d 535, 541, supra [bad acts of critical prosecution witnesses which are “ ‘directly probative of (such) witness’s veracity about matters on which he testifie(s) at the trial’”], citing People v Shakur, 169 Misc 2d 961, 973 [Sup Ct, NY County 1996].)
Impeachment evidence which concerns only collateral issues, however, is not exculpatory, and need not be disclosed as Brady material. (People v Cesar G., supra.) Accordingly, evidence of prior inconsistent statements, bad acts, criminal convictions and other general impeachment material not qualifying as exculpatory under the definition above need only be disclosed to the extent required by the provisions of CPL 240.44 and 240.45.
ii. Mitigating evidence
The capital sentencing scheme in our State contemplates a weighing by the jury , at the sentencing proceeding of aggravat *760 ing factors and mitigating factors to determine whether the sentence of death should or should not be imposed. (CPL 400.27 [11].) Aggravating factors, with two limited exceptions (see, CPL 400.27 [7] [a], [b]), must be established at trial and, once established, may not be relitigated at the sentencing proceeding. (CPL 400.27 [3].) Mitigating factors, on the other hand, may be established at the sentencing proceeding. (CPL 400.27 [6].) If the sentencing jury determines that the aggravating factor or factors for a count of murder in the first degree substantially outweigh the mitigating factor or factors established for that count beyond a reasonable doubt, and further decides unanimously that a sentence of death should be imposed, it may then direct that a sentence of death be imposed. (CPL 400.27 [11].)
Contrary to the People’s position, it therefore appears irrefutable that evidence which is material either to an aggravating factor or to a mitigating factor would be material to the defendant’s punishment. Such evidence, if favorable to defendant, clearly comes within the sweep of Brady (supra) and must be disclosed with other Brady material. (See, United States v Storey, 956 F Supp 934 [D Kan 1997] [approving pretrial discovery concerning mitigating factors pursuant to Brady v Maryland]; United States v Beckford, 962 F Supp 804 [ED Va 1997] [in capital case, prosecution required by Brady v Maryland to afford pretrial disclosure to defense of mitigating evidence in its possession]; Garcia v State, 622 So 2d 1325 [Fla 1993] [mitigating evidence that another person was the shooter should have been disclosed under Brady v Maryland, despite its failure to exculpate defendant on murder charge]; People v Arroyo, Schoharie County Ct, Aug. 27, 1997, indictment No. 97-13, supra [evidence tending to deny or explain statutory aggravating circumstance or tending to support existence of mitigating circumstance constitutes Brady material].)
The Supreme Court has made clear that the sentencing authority in a capital case must be permitted to consider any circumstances that might warrant a lesser penalty than death. (See, Lockett v Ohio, 438 US 586, supra; Woodson v North Carolina, 428. US 280, supra.) The New York Legislature specifically incorporated this requirement in CPL 400.27 (9) (f), which provides that a mitigating circumstance is “[a]ny other circumstance concerning the crime, the defendant’s state of mind or condition at the time of the crime, or the defendant’s character, background or record that would be relevant to mitigation or punishment for the crime.”
*761 Despite the breadth of CPL 400.27 (9) (f), however, the inclusion of mitigating evidence as Brady material does not entitle defendant to unlimited access to the victim’s property. Here, for example, it does not require production of lesson plans or other documents reflecting the victim’s views of capital punishment, as such information does not relate to any “circumstance concerning the crime” and, thus, would not be admissible at a sentencing proceeding as a mitigating factor under CPL 400.27 (9) (f) or Lockett (supra; see, Robison v Maynard, 829 F2d 1501 [10th Cir 1987]).
b. Duty of Prosecutor
With regard to the nature of the People’s obligation, the prosecution has a continuing duty to turn over clearly exculpatory material in its possession to the defendant “upon request”. (Brady v Maryland, 373 US 83, 87, supra.) If the subject matter of the defendant’s specific request is material, or if there is a “substantial basis” for claiming it is material, it is reasonable to require the prosecution to respond to it either by providing the information to the defense, or by submitting it to the court. (United States v Agurs, 427 US 97, 106, supra.) Indeed, “[w]hen the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable.” (Supra.) A prosecutor’s good-faith belief that the exculpatory evidence is unpersuasive does not excuse its nondisclosure. (People v Baxley, 84 NY2d 208, 213, supra; see also, United States v Beckford, supra, at 811 [nondisclosure not justified by prosecutor’s uncertainty as to sufficiency of evidence to establish a mitigating factor].) The prosecutor should resolve close questions in favor of disclosure. (United States v Agurs, 427 US 97, 108, supra.) The requirements of Brady go beyond the limits of knowledge of the prosecutor assigned to the case, extending to other prosecutors in the same office (Giglio v United States, 405 US 150, supra), and impose a duty to learn of any favorable evidence known to members of other agencies acting at the prosecution’s behest in the case. (Kyles v Whitley, 514 US 419, supra.)
It is the prosecutor’s duty to identify and disclose information within the State’s possession which constitutes Brady material. “[T]he prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make *762 disclosure when the point of ‘reasonable probability’[12]is reached.” (Kyles v Whitley, supra, at 437.) The fact that this is a potentially capital case creates no reason to depart from the usual procedure in criminal cases, which is to rely on the prosecutor’s representation as to the existence of Brady material, unless there is some reason to question it. (See, United States v McVeigh, 923 F Supp 1310, 1314 [D Colo 1996].)
Where a question does exist as to the exculpatory nature of specifically demanded material, however, the duty of identifying Brady material should not be left entirely with the prosecutor. Judicial involvement may be necessary to assure that all material subject to production is in fact disclosed: “While a prosecutor must of necessity ‘have some discretion in determining which evidence must be turned over to the defense’ (People v Fein, 18 NY2d 162, 171-172 * * * ), where, as here, there was some basis for argument that material in the possession of the prosecutor might be exculpatory, deference to the prosecutor’s discretion must give way, and the duty to determine the merits of the request for disclosure then devolves on the trial court.” (People v Consolazio, 40 NY2d 446, 453 [1976], cert denied 433 US 914 [1977].) Thus, where some basis has been advanced that the material might be exculpatory, the trial court must conduct an in camera review to determine the merits of the claim. (Supra.)
In attempting to define the necessary showing which would trigger an in camera review, the Court of Appeals has explained that the term “some basis” is not capable of precise definition: “In the context in which it is used here, it certainly contemplates more than purely subjective assertion of a defendant’s desire for information. On the other hand, a defendant is not required to demonstrate, in advance of the holding of the inquiry he seeks, that that inquiry will in fact necessarily result in a finding of materiality. Between these extremes, in most instances, disclosure rests within the compass of the Trial Judge’s sound discretion, exercised in the perspective of the issues in the particular case, the nature of the other proof known to him and other relevant circumstances, including the risk of reprisal, if any, against the witness whose identity is revealed. Beyond that, except to the extent that we do so by our decision in cases such as the present one, the quest for what Brandéis called ‘the true rule’ must await the step-by-step and case-by-case evolution characteristic of the common law.” *763 (People v Andre W., 44 NY2d 179, 185 [1978].) The Court then suggested ways in which the trial court could determine whether there is “some basis” to believe that the prosecution may possess potentially exculpatory evidence. In some cases, the prosecutor’s representation that evidence is inculpatory might be sufficient to deny a Brady motion. In other instances, the court might find it necessary to interview allegedly exculpatory witnesses in chambers, or to hold a formal hearing in counsel’s presence as to whether Brady material is in the People’s possession. (Supra; see, People v Poole, 48 NY2d 144, 149 [1979].)[13]
In this case, hundreds of documents have been recovered from the crime scene and vouchered by the police. The defense has thus far been afforded the opportunity to review only a small portion of these documents. This court has no intention of taking on the prosecutor’s duty to ferret out and disclose Brady material. Accordingly, only in instances in which the defense has identified a specific situs of information and has demonstrated some basis for believing it to contain material which is exculpatory will this court undertake an in camera review.
c. Timing of Disclosure
The concept of fundamental fairness on which the requirement of Brady disclosure is premised is designed to ensure that the defense receives exculpatory information at a meaningful point in the proceedings, i.e., when counsel still has a significant opportunity to put the information to use. (People v Cortijo, 70 NY2d 868 [1987]; People v Brown, 67 NY2d 555 [1986], cert denied 479 US 1093 [1987].) In some cases, the production of such information during the prosecution’s case (People v Cortijo) or even subsequent to a Wade hearing and during cross-examination of an identifying witness at trial (People v Brown) will suffice to afford the defendant a “meaningful opportunity” to put the information to use.
On the other hand, in situations in which the requested information could help the defense chart its course for the investigation and defense of the case, a meaningful opportunity may be lost if production of the information is delayed until commencement of trial. For example, merely advising the *764 defense of the contents of a witness’ exculpatory statement while refusing to identify the witness prior to trial has been held a denial of due process under Brady (supra), where such a tactic would have effectively prevented the defense from attempting to develop information from the witness in time to use it at trial. (People v Thomas, NYLJ, June 17, 1993, at 24, col 6 [Sup Ct, NY County 1993], citing People v Rivera, 119 AD2d 517 [1st Dept 1986].) And in Vilardi itself, the Court emphasized that “[i]t [was] the reasonable possibility that the undisclosed evidence might have led to a trial strategy that resulted in a different outcome * * * that require[d] reversal.” (76 NY2d 67, 78, supra.) Similarly, in United States v Bagley (473 US 667, 682 [1985]), the Supreme Court observed that the failure to respond completely to a specific request could create a misleading impression that certain evidence did not exist, which could cause the defense to “abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued.”
CPL article 240 by its terms requires that discovery material be produced by the People “upon a demand” of the defendant prior to trial and, in most cases, within 45 days of arraignment. (CPL 240.20, 240.80.) Case law in this State holds that disclosure of exculpatory evidence in the People’s possession must be made “in advance of trial.” (People v Springer, 122 AD2d 87, 90 [2d Dept 1986], lv denied 69 NY2d 717 [1986]; People v Saddy, 84 AD2d 175, 178 [2d Dept 1981], citing United States v Bryant, 439 F2d 642 [DC Cir 1971].)
Trial courts in our State have long recognized that information which is clearly exculpatory should be disclosed at the earliest possible opportunity in advance of trial, in order to permit the defense sufficient time to investigate it and present it at trial. (People v Jackson, 168 Misc 2d 182, 186 [Sup Ct, Bronx County 1995]; People v Hunter, 126 Misc 2d 13, 15 [Sup Ct, NY County 1984]; People v Bottom, 76 Misc 2d 525, 528 [Sup Ct, NY County 1974] [Brady decision prohibits suppression of favorable evidence “upon request” and does not limit disclosure to any particular stage of proceedings].) Postponing disclosure of such information tends to put the strategic planning of the defense in the hands of the prosecution to the same extent as a total failure to disclose, making the prosecutor the architect of a case, a circumstance that does not comport with minimal standards of justice. (People v Hunter, supra, at 16, citing Brady v Maryland, 373 US 83, 88.)
This consideration has been recognized in the American Bar Association Standards for Criminal Justice, Prosecution Func *765 tion and Defense Function, Standard 3-3.11 (a) (3d ed 1993): “A prosecutor should not intentionally fail to make timely disclosure to the defense, at the earliest feasible opportunity, of the existence of all evidence or information which tends to negate the guilt of the accused or mitigate the offense charged or which would tend to reduce the punishment of the accused.” (Emphasis added.)
In a capital case, the need for exhaustive investigation and thorough trial preparation by the defense team is of paramount importance, given the potential consequences of the case. Every effort must be made to disclose exculpatory information at a sufficiently early point in the proceedings to afford the defense a meaningful opportunity to investigate it and evaluate its application to its strategy for either the trial or sentencing proceeding, or the fundamental fairness required by due process may be lacking. (See, United States v McVeigh, 923 F Supp 1310, 1315, supra [recognizing that purpose of Brady disclosure is to give defendants fair opportunity to prepare defense well in advance of trial and ordering immediate disclosure].) Indeed, the relevant time for defense counsel to consider mitigating evidence is generally in advance of trial. (See, ABA Guidelines for Appointment and Performance of Counsel in Death Penalty Cases, Guideline 11.4.1 [1988] [investigation of matters relating to penalty phase should commence “immediately upon counsel's entry into the case”].) The investigation will also assist counsel in determining the propriety of entering into plea negotiations with the prosecution.[14]
Of course, the determination of the adequacy of the timing of the disclosure will depend upon the nature of the information and its potential impact on the defense of the case. To the extent that the prosecution has concerns about witness safety or intimidation, appropriate safeguards, including the issuance of protective orders and limiting disclosure to counsel, may be sought by the People. (See, People v Andre W., 44 NY2d 179, supra; CPL 240.50 [1].)
*766 The People argue that CPL 400.27 (14), authorizing discovery after conviction in aid of the sentencing proceeding, relieves them of any obligation to provide discovery relevant to sentencing until after the conclusion of the trial. That section, however, contains no requirement that discovery of such evidence be delayed until after conviction. Rather, the statute merely requires disclosure “[a]t a reasonable time prior to the sentencing proceeding” “unless previously disclosed” (CPL 400.27 [14] [a] [i]). CPL 400.27 (14), therefore, can only be read as requiring production of any items not yet turned over, and not as creating any limitation on the pretrial requirements of CPL 240.20 (1) (h).
The People’s reliance on cases such as United States v Higgins (75 F3d 332 [7th Cir 1996]), United States v Woodley (9 F3d 774 [9th Cir 1993]), United States v Gordon (844 F2d 1397 [9th Cir 1988]), and United States v Escobar (842 F Supp 1519 [ED NY 1994]), as authority for the proposition that the People are not obliged to provide Brady material prior to trial is unpersuasive. These and other cases cited by the People are similar to People v Cortijo (70 NY2d 868, supra) in that they involve appellate review of posttrial claims of Brady violations, and hold merely that no blanket rule requiring pretrial disclosure of Brady material is required, provided that disclosure is made when it is still of substantial value to the accused. Notably, none of these cases involved a capital charge. Application of the Cortijo rule in a capital case, for the reasons stated, generally will require disclosure at the earliest possible moment and well before trial.
The prosecution’s argument that pretrial provision of Brady material is not mandated because the obligation is one of disclosure, rather than discovery, is similarly unavailing. While the prosecutor’s obligation to disclose exculpatory information does not automatically entail a duty to produce it (People v Jenkins, 41 NY2d 307, 309, supra), CPL 240.20 (1) (h), as noted, makes the requirement one of discovery as well. Of course, once an exculpatory witness is identified to the defendant, the prosecutor’s duty ends, provided that the witness is equally available to the defense. (People v Rahman, 155 Misc 2d 60, 63 [Sup Ct, NY County 1992].)
The People’s reliance on cases such as United States v Presser (844 F2d 1275 [6th Cir 1988]) and United States v Higgs (713 F2d 39 [3d Cir 1983]) to justify delaying their disclosure of witnesses’ exculpatory statements is also misplaced. These cases interpret a provision of the Federal Jencks Act which specifi *767 cally prohibits disclosure of witnesses’ statements until after the witnesses’ direct testimony. (See, United States v Presser, supra, at 1283; 18 USC § 3500 [a]; but see, United States v McVeigh, 923 F Supp 1310, 1315, supra [Brady obligations neither altered nor modified by fact that information is contained in witness statements or Grand Jury testimony].) In this case, of course, the Jencks Act is inapplicable. In New York’s statutory scheme, the discovery rule of CPL 240.20 (1) (h) is neither expressly nor implicitly overridden by the Rosario disclosure provisions of CPL 240.44 and 240.45.
4. Sixth Amendment
Defendant asserts that expanded and pretrial discovery in this case is also mandated by the Sixth Amendment, arguing that without such discovery, counsel will be unable to adequately prepare for trial.
No portion of the Sixth Amendment, however, entitles defendant to discovery beyond the requirements of CPL 240.20, even in a capital case. (See, Matter of Pirro v LaCava, 230 AD2d 909, supra.) The cases cited by defendant, e.g., Pointer v Texas (380 US 400 [1965]) and Taylor v Illinois (484 US 400 [1988]), do not hold otherwise.
B. Legal Conclusions
Applying the above principles to the issues raised by defendant’s motion, the court’s legal conclusions are summarized as follows:
(1) Names, addresses and birth dates of witnesses
This information is discoverable prior to trial, except to the extent that such information is subject to the People’s pending motion for a protective order (see, People v Rivera, 119 AD2d 517, 519, supra), and with the further restriction that the information provided shall be used solely by defense counsel and persons working under their direction, and shall not be disclosed to defendant nor anyone else. Alternatively, in lieu of such disclosure, the People may arrange for such individuals to be interviewed by defense counsel at a time convenient to all parties.
(2) Impeachment evidence relevant to prosecution witnesses
To the extent that such evidence consists of information concerning a witness’ ability to perceive and recall relevant events, the witness’ potential bias, hostility, or motive to fabricate, or constitutes other information which, if known to the *768 trier of fact, could possibly affect the outcome of the trial, it must be produced along with other Brady material. This includes information pertaining to cooperation agreements, witness recantation, impairment of memory or communications skills at times relevant to the case due to substance abuse or mental illness, or bad acts of prosecution witnesses which are directly probative of credibility on matters which are the subject of the witness’ testimony. Other impeaching information, however, is not exculpatory and need not be disclosed prior to trial. (See, CPL 240.45.)
(3) Statements of witnesses and of the codefendant, together with information bearing on the voluntariness of such statements
Except to the extent such information must be produced pursuant to the Brady/Giglio rule, witnesses’ statements and information regarding the circumstances under which they were made are not subject to disclosure prior to trial. (CPL 240.45.) Statements of the codefendant are subject to discovery pursuant to CPL 240.20 (1) (a), and to the extent not previously provided, must be turned over in accordance with the statutory requirements. Defendant has shown no standing on this record to seek discovery of information relating to the voluntariness of the codefendant’s statements.
(4) Statements made by defendant to individuals other than law enforcement officers
To the extent the People intend to use such statements at trial on direct, cross-examination, or rebuttal, and to the extent they may be inadmissible as involuntary within the meaning of CPL 60.45, the People must disclose them to the defense at this time to enable defendant to avail himself of suppression procedures pursuant to CPL 710.20 (3) and 710.40 (1).
(5) Personal items belonging to the alleged victim recovered from the crime scene
To the extent there exists a substantial basis for concluding that such material is exculpatory, the prosecution must disclose it to the defense. Where defendant has demonstrated some basis for believing that the material might contain exculpatory information, it must be turned over to the court for in camera review. The balance of this material is beyond the scope of discovery.
(6) Mitigating evidence relevant to any prospective sentencing proceeding
*769 This information is discoverable prior to trial pursuant to CPL 240.20 (1) (h) and Brady (supra), and must be disclosed at this time.
(7) Other police reports
To the extent defendant seeks additional material beyond the substantial amount of police reports already provided, his request is beyond the scope of discovery, except to the extent it is subject to production as Brady or Rosario material.
(8) Timing of disclosures
Discovery of the information subject to production under article 240 is directed to occur within 15 days of the date of this order, except to the extent it is either the subject of the People’s pending motion for a protective order or other direction of this court. Brady material must be disclosed on a continuing basis pursuant to CPL 240.20 (1) (h) as soon as the People become aware of it. Disclosure of exculpatory witness statements should not await Rosario production on the eve of trial pursuant to CPL 240.45, but must be turned over with other Brady material.
C. Specific Demands
The court’s specific holdings applying these rules to each item sought are reflected below. [This portion of opinion omitted for purposes of publication.]
V. people’s motion for reciprocal discovery
The People move for reciprocal discovery pursuant to CPL 250.20 and 240.30 (1). The People also move for an order precluding defendant from offering any psychiatric evidence at trial, due to his failure to serve notice pursuant to CPL 250.10 within 30 days of entry of his plea of not guilty to the indictment.
Defendant is reminded of his continuing obligation under CPL 240.60 to comply with the People’s request. Accordingly, once defendant determines he has information subject to discovery under the terms of CPL 240.30 which he intends to introduce at trial, he must provide it to the prosecutor. In view of the complexities of the case, defendant must furnish such discovery to the People no later than 30 days prior to trial. The People’s application pursuant to CPL 250.10 (2) is denied as premature, without prejudice to its renewal 30 days prior to trial.
Should defendant perceive a need for relief from this directive on constitutional or other grounds, he may refuse the *770 demand and seek a protective order or leave to present evidence in camera. (CPL 240.35, 240.80, 240.90 [3].)
VI. CONCLUSION[15]
For all of the foregoing reasons, defendant’s motion for an order declaring that heightened scrutiny be applied to all phases of this case is denied. Defendant’s motion to compel discovery is granted to the extent indicated, subject to this court’s resolution of the People’s pending motion for a protective order. The People’s motion for reciprocal discovery is granted to the extent indicated.
[Portions of opinion omitted for purposes of publication.]

. At the expiration of the 120-day statutory period established by GPL 250.40, the People announced that they would not be seeking the death penalty in this case. The People’s notification arrived as this decision was sub judice. Despite the fact that the prosecutor’s decision renders the aspects of the decision relating to capital cases inapplicable to this particular case, the issues will be addressed here due to their likelihood of recurrence. (See, Matter of Johnson v Pataki, 229 AD2d 242, 245, n 1 [1st Dept 1997].) Although a trial court is usually not in a position to advance such a rationale for ruling on issues which have become “moot”, the fact that this court is one of only seven in this judicial district designated to handle capital cases compels the conclusion that these issues will recur before this court and can profitably be addressed at this time. (See, People v Cajigas, NYLJ, Oct. 28, 1997, at 30, col 3 [Westchester County Ct 1997].) For purposes of this case, however, discovery and disclosure of items relating to capital sentencing will not be required.

. The court’s determination of the People’s motion for a protective order will be the subject of a separate decision and order.

. The People have also agreed to share with defendant certain material which they have subpoenaed from third parties which pertains to defendant’s background, and have consented to permit defense counsel and the court to review such material prior to receiving it themselves.

. The People refuse to provide a witness list despite counsels’ assurance that defendants will not have access to such information. They have also declined defendant’s request to serve defense subpoenas on witnesses known to them. With respect to witnesses the People do not intend to call at trial, the People assert that they cannot furnish this information because they have not yet determined whom they will call as witnesses.

. While the People acknowledge defendant’s right to discover the search warrants and underlying applications, as noted (supra, n 2), they have separately moved pursuant to CPL 240.50 for an order delaying discovery of information contained therein concerning nonpolice witnesses, except to the extent that such information must be disclosed as exculpatory material pursuant to Brady v Maryland (373 US 83 [1963]).

. On occasion, the Court has also appeared to apply higher standards to capital cases under the US Constitution Fifth Amendment’s Due Process Clause. (See, Kyles v Whitley, 514 US 419 [1995] [review of adequacy of prosecutor’s guilt phase compliance with Brady v Maryland, supra]; Ake v Oklahoma, 470 US 68, 87 [1985] [Burger, Ch. J., concurring] [requiring provision of psychiatrist to indigent defendant where mental condition to be an issue in the guilt or penalty phase].)

. See, e.g., People v Arroyo, Schoharie County Ct, Aug. 27, 1997, indictment No. 97-13 (heightened due process not applicable at Grand Jury stage); People v Cajigas, 174 Misc 2d 472 (Westchester County Ct 1997) (strict scrutiny does not apply to early stages of capital proceedings); People v Bell, NYLJ, June 16, 1997, at 32, col 5 (Sup Ct, Queens County 1997) (heightened due process not applicable to Grand Jury proceedings); People v Hale, 173 Misc 2d 140 (Sup Ct, Kings County 1997) (no support for extending Beck v Alabama, supra, to require application of heightened due process to every aspect of proceedings); People v Bell, 172 Misc 2d 308 (Sup Ct, Queens County 1997) (higher standard of due process not applicable to judicial selection process); People v Reed, Dutchess County Ct, May 31, 1997, indictment No. 42-96 (heightened due process not applicable at Grand Jury stage); People v Williamson, 172 Misc 2d 172 (Rensselaer County Ct 1997) (capital defendant not entitled to additional rights); People v Page, Sup Ct, Kings County, Mar. 7, 1997, indictment No. 9833/96 (motion for order formally requiring application of heightened scrutiny and standard of due process denied); People v Shulman, 172 Misc 2d 535 (Suffolk County Ct 1997) (heightened due process not applicable to discovery proceedings); People v McIntosh, 173 Misc 2d 724 (Dutchess County Ct 1997) (heightened due process not required at preliminary stages of pretrial process); People v Szlekovics, Monroe County Ct 1996, indictment No. 96-915 (heightened standard of due process not applicable throughout pretrial and trial phases); People v Chinn, NYLJ, Nov. 19, 1996, at 31, col 3 (Onondaga County Ct 1996) (heightened due process not applicable at all stages of capital case); People v Bastien, 170 Misc 2d 103, 106 (Sup Ct, NY County 1996) (heightened due process applies only after conviction for capital offense); People v Diaz, NYLJ, Aug. 8, 1996, at 24, col 4 (Sup Ct, *751 Bronx County 1996) (heightened due process applies at sentencing stage, not Grand Jury stage); People v Mower, NYLJ, May 24, 1996, at 36, col 4 (Otsego County Ct 1996) (heightened standard of review and care not applicable to discovery proceedings); People v Heard, NYLJ, May 17, 1996, at 26, col 6, supra (heightened due process not applicable at Grand Jury); People v Rodriguez, 168 Misc 2d 219 (Sup Ct, NY County 1996) (heightened due process applicable at sentencing phase only); Matter of Faulkner v Carney, 166 Misc 2d 886 (Sup Ct, Schenectady County 1995) (no constitutional requirement that procedure be modified for capital cases); but see, People v Prater, 170 Misc 2d 327 (Sup Ct, Kings County 1996) (due to uniqueness of death penalty legislation and unprecedented power it places in prosecution, departure of existing law governing Grand Jury presentation warranted, i.e., where defendant offers evidence of extreme emotional disturbance, Grand Jury should be instructed as to impact of such evidence); People v Rodriguez, Sup Ct, NY County, June 20, 1996, indictment No. 10663/95 (court directed prosecution not to introduce at single Grand Jury proceeding statements made by both defendants in light of potential capital nature of case and possibility that one statement could raise offense from second degree murder to first degree murder); People v Castillo, Westchester County Ct, Dec. 22, 1995, indictment No. 95-1678 (higher standard of due process required in capital cases).

. The risk of unreliability in capital sentencing determinations has been recognized as a substantial one. (See, e.g., Hoffmann, Where’s the Buck?— Juror Misperception of Sentencing Responsibility in Death Penalty Cases, 70 Ind LJ 1137 [1995]; Luginbuhl and Howe, Discretion in Capital Sentencing Instructions: Guided or Misguided?, 70 Ind LJ 1161 [1995].)

. See, CPL 400.27 (7) (a), (b). Even where evidence of these supplemental aggravators is presented, however, the jury will first have convicted the defendant of at least one count of murder in the first degree, thereby establishing an aggravating factor during the trial, rather than during the sentencing proceeding.

. In fact, New York’s statute presents a clearer case of death eligibility determination during the trial than did the statute in Lowenfield, (supra), as there, the initial guilt phase finding of the existence of the aggravating factor was not binding and could be relitigated during the sentencing proceeding. (La Code Crim Proc Annot arts 905.2, 905.3.)

. See discussion (infra, at 759-761) with respect to the prosecution’s duty to disclose mitigating evidence under the principles of Brady v Maryland (373 US 83, supra).

12. As to specifically requested items, of course, Vilardi (76 NY2d 67, supra) sets the disclosure point at “reasonable possibility.”

. See also, People v Chambers, 134 Misc 2d 688 (Sup Ct, NY County 1987), where the court examined the homicide victim’s diary in camera in the interest of justice, despite the lack of a showing that it potentially contained Brady material or was otherwise discoverable.

. During the period from the effective date of New York’s first degree murder statute through October 10, 1997, 21 defendants charged with murder in the first degree have pleaded guilty. Thirteen have been sentenced to life imprisonment without parole. Although this court is not aware of any plea discussions in the instant case, it would seem essential that defense counsel be aware of the existing evidence respecting both aggravating and mitigating circumstances in the case in order to responsibly counsel a teenaged defendant on the advisability of pleading guilty in exchange for a sentence of life imprisonment without parole.

. Nothing discussed above should be viewed as suggesting that the District Attorney’s disclosures in this case have been anything other than commendable, as the defense itself acknowledges. While falling short of “open file” discovery, extensive amounts of material have been furnished to the defense, generally as the prosecution itself has received them, even in the absence of specific demands by defendants. The level of cooperation exhibited thus far by all counsel in this case has been exemplary. The few points of disagreement which required the court’s intervention on this motion involved narrow legal issues which the parties’ own efforts failed to resolve and as to which each side held its own good-faith interpretation in this developing area of the law.